PHILLIPS PETROLEUM COMPANY,
Plaintiff,

v.

DEPARTMENT OF ENERGY,
Defendant.

TENNECO OIL COMPANY, Plaintiff,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

PENNZOIL COMPANY, Plaintiff,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

COASTAL STATES GAS CORPORA-
TION, Plaintiff,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

CONTINENTAL OIL COMPANY,
Plaintiff,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

AMERADA HESS CORPORATION,
Plaintiff,

v.

DEPARTMENT OF ENERGY,
Defendant.

Civ. A. Nos. 77–90, 77–130, 77–131,
77–144, 77–155 and 77–407.

United States District Court,
D. Delaware.

March 9, 1978.

worski, Houston, Tex., for Coastal States Gas Corp.

Rush Moody, Jr., Michael J. Henke, Mary Jane Reynolds and F. Shaun Burns of Vinson & Elkins, Washington, D.C., for Continental Oil Co.

Kenneth L. Bachman of Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Amerada Hess Corp.

James W. Garvin, Jr., U.S. Atty. and John H. McDonald, Asst. U.S. Atty., Wilmington, Del., Barbara Allen Babcock, Asst. Atty. Gen., Dennis Linder and C. Max Vassanelli, Attys., Dept. of Justice, Washington, D.C., Scott H. Lang, Atty., Dept. of Energy, Washington, D.C., for defendants.

## OPINION

LATCHUM, Chief Judge.

Six oil companies[1] instituted these actions to challenge the Federal Energy Administration's ("FEA") belated interpretation of a regulatory scheme affecting prices from January 1, 1975 to February 1, 1976 ("the relevant period"). That interpretation required refiners to allocate monthly sales revenues first to the recoupment of all increased "product costs" (primarily the costs of crude oil and purchased petroleum products) and then to the recoupment of increased "non-product costs" (most operating and marketing costs). See 41 Fed.Reg. 5111, 5113 (February 4, 1976). The defendants are the Department of Energy ("DOE") and its Secretary, as successors in interest of the FEA and its Administrator.[2] In their complaints[3] the plaintiffs sought

S. Samuel Arsht and William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for all plaintiffs.

Paul J. Mode, Jr., Michael S. Helfer, Stewart A. Block, William J. Perlstein, and Paul Koffsky of Wilmer, Cutler & Pickering, Washington, D.C., for Phillips Petroleum Co.

John P. Mathis and Thomas J. Eastment of Baker & Botts, Washington, D.C., for Tenneco Oil Co. and Pennzoil Co.

David J. Beck, Laurance C. Mosher, Jr., and O. David Stephens of Fulbright & Ja-

---

1. The following five plaintiffs filed their suits in March and April 1977: Phillips Petroleum Company, Tenneco Oil Company, Pennzoil Company, Coastal States Gas Corporation, and Continental Oil Company. The sixth oil company, Amerada Hess Corporation, did not file suit until October, 1977, but by stipulation of the parties its action has been consolidated with the others. Docket Item 77 (unless otherwise noted, references to the record pertain to Civil Action No. 77–90).

2. F.R.Civ.P. 25. The FEA became part of the DOE on October 1, 1977. Pub.L.No.95–91,

§§ 301(a), 705(e), 91 Stat. 565; Exec. Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977). Because the administrative activity at issue in this case occurred before the creation of the DOE, the defendant will be referred to as the FEA herein.

The Secretary has been named as a defendant in only four of the six suits; references throughout the opinion to the FEA include the Secretary.

3. See Docket Item 1.

(1) a declaratory judgment concerning the meaning and validity of the regulations during the relevant period, (2) an injunction against the FEA's anticipated application of its interpretation of the regulations, (3) an estoppel against FEA enforcement of its interpretation against the plaintiffs on the basis of their good faith reliance on the conduct and statements of various FEA officials, and (4) a determination whether the plaintiffs' constitutional claims are substantial and should be certified to the Temporary Emergency Court of Appeals ("TECA").

On August 11, 1977, 435 F.Supp. 1239, the Court granted in part and denied in part the FEA's motion [4] to dismiss the actions or stay them pending completion of administrative consideration.[5] The Court held that the following legal issues were appropriate for immediate consideration: [6]

(1) What is the meaning of the applicable regulations in effect during the relevant period, e. g., did they permit or require the use of the Proportional Method to recover increased costs, (2) If the regulations were in effect as now interpreted by the FEA, are such regulations invalid because they (a) exceeded FEA's statutory authority, (b) were issued without notice and applied retroactively in violation of the Administrative Procedure Act, 5 U.S.C. § 553, or (c) were . . . issued without first obtaining an inflationary impact statement in violation of

Executive Order No. 11821, 39 Fed.Reg. 41501 (Nov. 29, 1974).

435 F.Supp. at 1249. The parties have filed cross-motions for summary judgment [7] and this opinion addresses the issues raised by those motions.

One other prefatory remark is in order, however. The United States District Court for the Northern District of Ohio recently granted summary judgment against the FEA on issues 1 and 2(b) above in nine related actions brought in that District ("the Ohio litigation") [8]. This Court previously denied a motion by the FEA to transfer the instant actions to the Northern District of Ohio, or, alternatively, to stay the cases *sub judice* until a decision was rendered in the Ohio litigation.[9] The principal distinction between these cases and the Ohio litigation is that all of the plaintiffs here recovered their product and non-product cost increases on a pro-rata basis, while the majority of the Ohio plaintiffs recovered their non-product cost increases first.[10] The underlying facts are the same in both instances and have been set forth in detail in the two opinions filed by Judge Manos of the Northern District of Ohio.[11]

## I. BACKGROUND FACTS

On August 19, 1973, the Cost of Living Council ("COLC") adopted a complex set of price regulations specifically applicable to the petroleum industry.[12] The regulations

---

**4.** Docket Item 9.

**5.** *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239 (D.Del.1977). The Court dismissed the plaintiffs' estoppel claims and their claims that the regulations were invalid because they were not supported by a rational basis, because those issues were not ripe for judicial determination. *Id.* at 1246 n. 8, 1249.

**6.** The Court deferred indefinitely consideration of whether the plaintiffs' constitutional claims should be certified to TECA. *Id.*

**7.** Docket Items 78 and 86.

**8.** *Standard Oil Co., et al. v. FEA, et al.,* ("Standard Oil II"), Case No. C76–1279 (N.D.Ohio,

January 20, 1978). In a prior opinion the Ohio court denied a motion by the FEA to dismiss the actions on the ground of ripeness. *Standard Oil Co. v. FEA,* ("Standard Oil I"), 3 CCH Energy Management ¶ 26,079, p. 26,614 (N.D. Ohio 1977).

**9.** *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1234 (D.Del.1977).

**10.** *See id.* at 1236, 1238.

**11.** *See* note 8 *supra.*

**12.** 6 C.F.R. Part 150, Subpart L, 38 Fed.Reg. 22356 (August 22, 1973).

were promulgated under the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note, and Phase IV of the Economic Stabilization Program. In December 1973, the Federal Energy Office ("FEO") assumed the pricing authority of the COLC as it related to energy,[13] and on January 14, 1974, the FEO recodified the COLC's Phase IV Petroleum Price Regulations.[14]

The regulations in effect in January 1974 imposed a ceiling on the prices that the plaintiffs and other refiners could charge based on each refiner's selling prices on May 15, 1973. However, at the beginning of each month a refiner could increase its selling prices for the coming or "current" month to reflect the increased product costs it incurred in the preceding month ("the month of measurement"). The regulations permitted a refiner complete discretion to charge any price to a particular class of purchasers in the current month up to a price equal to the sum of (1) the weighted average price charged to the same class of purchasers on May 15, 1973 and (2) the increased product costs[15] incurred between the month of measurement and the month of May 1973. See 10 C.F.R. § 212.83(f), 39 Fed.Reg. 1953 (January 15, 1974). The latter price was known as the "base price" for a product. Thus a refiner could pass

through its product cost increases ("PCI") on a dollar-for-dollar basis by charging a selling price equal to the base price in the month following the month in which the PCI were incurred. Any product cost increases which a refiner was unable to recover in a price increase in the current month, because of competitive market conditions or other reasons,[16] could be carried over or "banked" for use in determining base prices for a subsequent month.[17]

Besides enabling refiners to pass through increased product costs automatically as part of their base prices, the regulations authorized the pass-through of increases in non-product costs, such as labor and marketing costs, subject to certain limitations. Refiners could use their non-product cost increases ("NPCI") to justify a price exceeding the base price as long as they continued to incur those increases. However, a refiner first had to "prenotify" the FEO and then wait a minimum of thirty days before implementing the price increase.[18] The regulations also precluded a refiner from charging a price in excess of the base price in any fiscal year in which its profit margin exceeded the profit margin achieved during the base period (May 1973).[19] Non-product cost increases were computed using a "rate of increase" approach in contrast to product cost increases,

13. The President established the FEO pursuant to his authority under the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. § 751 et seq., which became law on November 27, 1973. See Exec. Order No. 11,748, 38 Fed.Reg. 33575 (December 6, 1973).

14. 39 Fed.Reg. 1952 (January 15, 1974); the FEO also renumbered the regulations so that those governing refiners appeared at 10 C.F.R. Part 212, Subpart E. Id.

15. The regulations defined "increased products costs" as
the sum of (1) the difference between the total cost of crude petroleum during the month of measurement and the total cost of crude petroleum during the month of May, 1973 plus (2) the difference between the total cost of petroleum product during the month of measurement and the total cost of petroleum product during the month of May, 1973

10 C.F.R. § 212.83(b), 39 Fed.Reg. 1954–55 (January 15, 1974).

16. Estimation errors may cause over- or under-recoupment of costs. For example, even if a refiner included all its PCI in selling prices for the current month, the revenues received at the end of that month would not be sufficient to recoup all the PCI if the refiner had overestimated the sales volume for the current month when he established the selling price.

17. 10 C.F.R. § 212.83(c), 39 Fed.Reg. 1924, 1955 (January 15, 1974).

18. 10 C.F.R. §§ 212.83(b), (c), 39 Fed.Reg. 1952, 1953 (January 15, 1974). Non-product cost increases were reduced to reflect productivity gains. Id.

19. 10 C.F.R. § 212.83(i), 39 Fed.Reg. 1954 (January 15, 1974).

which were computed using a "dollar amount" concept.[20] Finally, the regulations did not explicitly state whether NPCI could be banked.

The FEO became the Federal Energy Administration in June 1974.[21] In a notice of proposed rulemaking published on September 10, 1974, the FEA announced a "comprehensive revision" of the petroleum price regulations.[22] With respect to non-product cost increases, the FEA proposed to eliminate the "prenotification" procedure and to replace it with an automatic pass-through system similar to that used for the pass-through of increased product costs.[23] Effective December 1, 1974, the FEA adopted these changes and others which limited the categories of increased non-product costs that could be passed through to purchasers.[24] The base price concept was not altered.

In addition to finalizing several of the proposed amendments, the December 1974 rulemaking added a new provision [10 C.F.R. § 212.83(e)(4)], which prohibited the banking of unrecovered non-product cost increases.[25] This provision required refiners to absorb any non-product cost increases which they failed to recover through price increases in the month following the month in which the NPCI were incurred. The amount of NPCI a refiner would have to absorb in a given month depended, however, on the method or sequence used to allocate recoveries between product and non-product cost increases. The regulations did not explicitly specify a particular sequence of recovery;[26] consequently, refiners used at least three different methods. One method, the non-product cost increase first method ("NPCI First"), treated all non-product cost increases as having been recovered first, and the product cost increases as having been recovered last. A second method, the "NPCI Last" method, treated all product cost increases as having been recovered first, and non-product cost increases as having been recovered last. A third method, the "Proportional Method," treated product and non-product cost increases as having been recovered pro rata.[27] *Phillips Petroleum Co. v. FEA,* 435 F.Supp.

20. 10 C.F.R. § 212.83(c), 39 Fed.Reg. 1953 (January 15, 1974); for an explanation of the two methods, *see* 39 Fed.Reg. 32721 (September 10, 1974).

21. Exec. Order No. 11790, 39 Fed.Reg. 23185 (June 27, 1974). The Federal Energy Administration Act of 1974 ("FEAA"), 15 U.S.C. § 761 *et seq.,* became law on May 7, 1974. Pub.L.No. 93–275, 88 Stat. 97.

22. 39 Fed.Reg. 32720 (September 10, 1974).

23. *Id.* The FEA proposed to compute and pass-through NPCI using the same "dollar amount" concept that was being used for product cost increases.

24. *See* 10 C.F.R. § 212.81 *et seq.* (December 5, 1974). Because of the one-month delay imposed by the cost pass-through provisions, these amended regulations governed refiners' prices beginning on January 1, 1975. The categories of NPCI which could be passed through were: refinery fuel costs, labor costs, additive costs, certain marketing costs, and utility, pollution control, interest and container costs. 10 C.F.R. § 212.87(c), 39 Fed.Reg. at 42373–74.

25. 39 Fed.Reg. at 42372.

26. The FEA has admitted that the regulations did not explicitly address the sequence of recovery issue. *See* Docket Item 79, exh. D–2, p. 1 (memorandum from General Counsel of FEA to the Administrator); *Id.,* exh. D–6, p. 3 (Statement of Gorman C. Smith Before the Subcommittee on Energy and Power, Committee on Interstate and Foreign Commerce, House of Representatives, September 20, 1976). Congressman John Dingell, before whose subcommittee Mr. Smith was to have testified, refused to allow Mr. Smith to deliver his statement for reasons explained below. The statement had been cleared within the agency, however, and represented the agency's official position. Smith Dep., Docket Item 75A, pp. 195–96, 461–63.

27. In a letter, dated September 14, 1976, to Representative John E. Moss, Chairman of the Oversight and Investigations Subcommittee of the House Committee on Interstate and Foreign Commerce, FEA Administrator Zarb stated: "The regulations in effect during [the relevant] period contained ambiguities with respect to whether increased non-product costs could be recovered on [a proportional] basis." Docket Item 79, exh. D–4.

1239 (D.Del.1977). The example in the footnote [28] below illustrates the effect of each method on the amount of NPCI a refiner must absorb when revenues do not permit recoupment of all cost increases.

Between January 1, 1975, when the amendments to the regulations first affected prices, and February 1, 1976, several FEA officials, through instruction manuals, directives, forms and worksheets issued to FEA auditors and later disseminated to many refiners, as well as through private statements to refiners, indicated that the agency construed its regulations to permit or require the use of the proportional method.[29] Each of the six plaintiffs and at least twenty-three other refiners used the proportional method during the relevant period.[30]

In order to reflect the pricing policies of Sections 401 and 402 of the Energy Policy and Conservation Act of 1975 ("EPCA"),[31] the FEA promulgated amendments to its petroleum price regulations effective February 1, 1976.[32] One of these regulations (10 C.F.R. § 212.85) explicitly required refiners to use the NPCI Last method to calculate recoupment of increased costs.[33] In addition to setting forth a prospective rule, the FEA, in the preamble to the February 1, 1976 rulemaking, publicly announced for the first time its position that the regulations affecting pricing during the period from January 1, 1975 to February 1, 1976 had always required that "increased non-product costs . . . be recouped last." [34]

28. Assume that in a given month a refiner had incurred increased product costs of $70 and increased non-product costs of $30, a total of $100. Assume, however, that the refiner actually recovered during the following month only $90 (that is, 90 percent) of its increased costs. (This could happen, for example, because the refiner misestimated its sales when setting prices or because the market precluded charging the maximum allowable sales price.) Under the NPCI First method, the refiner would be deemed to have recovered $30 in non-product costs and $60 in product costs; it could bank the remaining $10 of product costs for recovery in later months. Under the NPCI Last method, the refiner would be deemed to have recovered $70 in product costs and $20 in non-product costs; it would lose forever the remaining $10 of non-product costs. Under the Proportional Method, the refiner would be deemed to have recovered $63 in product costs (90 percent of $70) and $27 in non-product costs (90 percent of $30); it could bank $7 of product costs for recovery in later months and would lose forever the remaining $3 of non-product costs.

29. *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239, 1243 (D.Del.1977); these communications are described in detail Part III.C, *infra.*

30. *See* 41 Fed.Reg. 40559, 40560 (September 20, 1976).

31. Pub.L.No.94–163, 89 Stat. 946 (codified at 15 U.S.C. § 753). Section 401 made explicit the FEA policies of permitting refiners to pass

through product cost increases on a dollar-for-dollar basis and of requiring the pass-through of product cost decreases as well. Section 402, among other things, limited the time allowed for the recoupment of PCI and the amount of "banked" PCI which could be passed through in a single month.

32. 41 Fed.Reg. 5111 (February 4, 1976).

33. 41 Fed.Reg. at 5120.

34. *See id.* at 5113. The notice of proposed rulemaking issued on January 7, 1976 contained no mention of the proper method or sequence of cost recovery. *See* 41 *Fed.Reg.* 1680 (January 9, 1976). In the preamble of the February 1, 1976 rulemaking, the FEA stated that the many comments it had received complaining about its silence on this issue had prompted the promulgation of the regulation requiring use of the NPCI Last method. 41 Fed.Reg. at 5113. The preamble contains the following explanation of the NPCI Last requirement:

Under FEA price regulations (*both prior to today's amendment and as amended*), refiners determine their "increased product costs" (composed of increased crude oil and purchased product costs) on a calendar month basis. . . . The total dollar amount of increased crude oil (and product) costs which is thus determined for a calendar month may not be passed through in prices for products which are above a refiner's May 15, 1973 prices until the calendar month following the month in which they were incurred and measured.

The FEA's endorsement of the NPCI Last method provoked immediate and widespread criticism from the refiners, who objected to its application prospectively, as well as retroactively. In April 1976, after providing notice and holding public hearings, the FEA revoked retroactively to February 1, 1976 the regulation requiring use of the NPCI Last method [35] and the pre-existent regulation prohibiting the banking of non-product cost increases.[36] The FEA found that these two regulations, if in effect at the same time, would spur inflation, cause widely fluctuating prices for petroleum products, discourage refiners from building product inventories, reduce refinery production, and diminish capital investments.[37] Despite these findings, the FEA deferred any decision on "appropriate action . . . regarding the rules on recoupment of increased non-product costs prior to February 1, 1976." [38]

Thereafter, the agency steadfastly maintained the position that the regulations affecting prices from January 1, 1975 to February 1, 1976 implicitly required refiners to use the NPCI Last method.[39] On August 3, 1976, however, the FEA proposed a "class exception" to permit all refiners who were not constrained by the profit margin limitation to recompute their increased cost recoveries during the relevant period using "the *proportional* cost recovery approach." 41 Fed.Reg. 33282, 33283 (August 9, 1976) (emphasis supplied). The agency noted that "many—perhaps even a majority of—refiners" had used either the proportional or the NPCI First method during the relevant period. Further, the FEA "acknowledge[d] that refiners might have concluded in good faith that recoupment on a proportional basis was permitted as a result of possibly ambiguous language in § 212.83(d) and certain information disseminated by FEA." *Id.* at 33283.

The responses of 104 refiners surveyed regarding the proposed class exception showed that many refiners had computed cost recoveries using a method other than the NPCI Last method.[40] The FEA concluded that as a result approximately $1.3 billion in additional non-product cost increases had been passed through in prices.[41] This information appeared in the *Wall Street Journal* on September 10, 1976 and immediately elicited a critical response

To the extent that the total amount of a refiner's increased costs of crude oil incurred in one calendar month (the "month of measurement") is not recovered in prices charged during the following calendar month (the "current month"), such increased costs may be carried forward or "banked" and passed through in prices charged in subsequent months, subject to certain limitations. *Non-product costs may not be "banked" and are therefore considered to be recouped only after all available "increased product costs" . . . have been applied to establish "base prices."*

. . . . .

Except for the complexities introduced by [the EPCA] . . . , *the order specified in the new § 212.85 is the same as that under the regulations previously in effect. Id.* (Emphasis supplied).

**35.** 41 Fed.Reg. 15330, 15331 (April 12, 1976).

**36.** *Id.* In a notice of proposed rulemaking published on March 3, 1976, the FEA stated that the purpose of requiring refiners to use the NPCI Last method was "to prevent refiners from carrying forward or banking increased non-product costs" in violation of § 212.-83(e)(9). The "practical effect" of using either the NPCI First or the proportional method, according to the FEA, was to permit the banking of non-product cost increases. 41 Fed.Reg. 9199 (March 3, 1976).

**37.** 41 Fed.Reg. 15331 (April 12, 1976).

**38.** *Id.* at 15330, 15333.

**39.** For a list of several occasions since February 4, 1976 on which the FEA has officially expressed this view, *see Phillips Petroleum Co. v. FEA, supra,* 435 F.Supp. at 1243.

**40.** The survey indicated that 29 refiners had recovered product and non-product cost increases proportionally; 29 other refiners recovered non-product costs first. 41 Fed.Reg. 40560 (September 20, 1976).

**41.** *Id.* at 40560.

from the Honorable John D. Dingell, Chairman of the Subcommittees on Energy and Power of the House Committee on Interstate and Foreign Commerce.[42] In the wake of further criticism from Congressman Dingell and discussions between the Congressman and FEA Administrator Zarb and his subordinates,[43] the FEA obsequiously changed its position and publicly announced: (1) that it would *not* grant exceptions to the enforcement of the NPCI Last method interpretation on the ground of "good faith reliance on erroneous guidance from FEA personnel" [44] and (2) that it would not grant the proposed class exceptions but would require each refiner to "establish . . . that it is subject to a serious hardship or gross inequity as a result of the FEA regulatory requirements." [45]

In late 1976 and early 1977, various refiners began filing applications for exception relief. On March 23, 1977 the FEA announced it would evaluate three of the exception applications before it as "representative" of the applications which had been filed or could be expected.[46] After holding three hearings, the FEA decided in April 1977 that it would not review the correctness of its interpretation of the regulations or the lawfulness of them, as construed, in the exception proceedings.[47] The agency also failed to formulate rules governing the procedures to be followed in the exception proceedings.[48] Discouraged by the limited scope of the exception proceedings and the procedural uncertainties, the three representative parties selected by the FEA withdrew their exception applications. Immediately thereafter, five of the six plaintiff refiners in these cases filed suit in this Court.

## II. CONTENTIONS OF THE PARTIES

The plaintiff refiners challenge the validity of the FEA's interpretation of the regulations on both substantive and procedural grounds. Substantively, the plaintiffs contend that the regulations in effect during the relevant period either required refiners to use the proportional method to compute cost recoveries or permitted them to do so, because there was no valid regulation prescribing a method for computing cost recoveries. The plaintiffs find support for an interpretation requiring use of the proportional method in numerous contemporaneous constructions of the December 1, 1974 regulations by FEA officials and auditors and also in the text of the regulations, specifically in 10 C.F.R. § 212.83(d). Moreover, the plaintiffs argue the regulations provide no support for the NPCI Last requirement which the FEA contends was applicable.

From a procedural standpoint, the plaintiffs assert that the purported regulation regarding the allocation of cost recoveries is invalid, because the FEA ignored all the applicable rulemaking requirements in promulgating it. The plaintiffs challenge the validity of the regulation prohibiting the banking of non-product cost increases for similar reasons, particularly the FEA's fail-

---

**42.** *See Standard Oil II, supra,* slip op. at 30. On September 17, 1976 Congressman Dingell issued a press release criticizing the FEA's proposal to permit refiners to retain overcharges stemming from a "good faith" misunderstanding of the regulations and scheduling a subcommittee hearing on the matter for September 20, 1976. Docket Item 79, exh. D–5.

**43.** The communications between Congressman Dingell and his staff and various FEA officials are described in *Standard Oil I, supra,* 3 CCH Energy Management ¶ 26,079, pp. 26,628–29, and *Standard Oil II, supra,* slip op. at 29–32.

**44.** 122 Cong.Rec. E 5298, 5299 (daily ed., September 27, 1976) (letter from FEA Administrator Zarb to Congressman Dingell).

**45.** 41 Fed.Reg. 43953, 43954 (October 5, 1976).

**46.** Apco Oil Corp., 5 FEA ¶ 83109 (March 23, 1977). One of the three applications had been filed by Continental Oil Company, a plaintiff herein.

**47.** Docket Item 10A, Att. G, p. 59.

**48.** *Id.* pp. 3–7; *Id.* Att. M, pp. 36–40.

ure to provide adequate notice and opportunity to comment.

The defendants on the other hand strenuously contend the requirement that non-product cost increases be recovered last, if at all, had been implicit in the petroleum price regulations for refiners from the beginning of Phase IV in the latter part of 1973 until the revision of the regulations, effective February 1, 1976. During that period, the FEA asserts, any method of cost recovery which would have permitted non-product cost increases to be recovered before all product cost increases had been recovered clearly would have contravened three regulatory provisions: (1) the "base price/price in excess of base price" rule; (2) the provision authorizing the banking of unrecovered increased product costs; and (3) the prohibition against banking unrecovered increased non-product costs. The FEA dismisses Change Notice 3–1975–1 [49] and the other communications cited by the plaintiffs, which required or permitted refiners to recover costs on a pro rata basis, as being nothing more than "unauthorized and unofficial guidance . . . disseminated by auditors during the first half of 1975 . . . which was plainly erroneous on its face." [50] While conceding that this allegedly erroneous advice may constitute a predicate for relief on grounds of detrimental reliance—an issue remanded to the agency for consideration in the first instance—the FEA argues that it should not be considered in determining the meaning of the regulations, because only the agency's lawyers have the authority to interpret its regulations. Further, the FEA contends that throughout the relevant period its official constructions of the regulations consistently required the use of the NPCI Last method and that its senior legal advisors did not "focus" on the problem of cost recovery until February 1976.

Because it contends the regulations implicitly required use of the NPCI Last method prior to and throughout the relevant period, the FEA responds to the procedural arguments of the plaintiff refiners by attempting to show that each of the regulations giving rise to the implication of the NPCI Last requirement was promulgated in accordance with the requisite rulemaking procedures.

These cases are presently before the Court on cross-motions for summary judgment. Having concluded that there is no genuine issue as to any material fact and that all material issues can be decided as a matter of law, the Court finds these cases appropriate for disposition by way of summary judgment. Fed.R.Civ.P. 56.

### III. THE MEANING OF THE REGULATIONS

It is undisputed that the regulations at issue here contained no explicit provision governing the method of allocating product and non-product cost recoveries. The FEA, however, urges the Court to find that the regulations, as construed by it, implicitly required the use of the NPCI Last method for computing cost recoveries. Whether the regulations required use of this method or simply failed to require the use of any particular method, as the plaintiffs contend, depends on (A) the meaning of the regulations in effect prior to the relevant period, (B) the meaning of the amendments to the regulations adopted in December 1974 and the effect of those amendments on the overall regulatory scheme, and (C) the contemporaneous construction of the amendments by the agency and its officials. The Court now turns to an examination of those matters.

---

**49.** Docket Item 79, exh. A–3. This Change Notice was issued by members of FEA's National Compliance Office staff in January 1975 and instructed the agency's auditors to compute increased cost recoveries on a proportional basis.

**50.** Opening Memorandum in Support of Defendant's Motion for Summary Judgment, Docket Item 80, p. 85.

A. *The Regulations in Effect Prior to the Relevant Period.*

The base price and banking concepts, as they are applicable here, originated in Phase IV of the Economic Stabilization Program. Under Phase IV, large manufacturers other than refiners could increase their prices above base prices (the average price charged during a historical base period) only in order to pass through allowable cost increases. Manufacturers who charged prices in excess of base prices were subject to profit margin limitations and had to prenotify their cost increases to the COLC at least 30 days before implementing a price increase.[51] On August 17, 1973 the COLC adopted special regulations governing the pricing of petroleum products, which defined "base price" as the refiner's selling price on May 15, 1973 plus the increased costs of imports and domestic crude petroleum above the May 15, 1973 cost.[52] Due to this unique definition of base price, refiners could pass through automatically on a dollar-for-dollar basis their product cost increases. With respect to other allowable cost increases (non-product cost increases), however, refiners were subject to the same constraints as large manufacturers. Such costs could be used to justify a price in excess of base price, but only if the refiner met the profit margin limitation and prenotified the COLC of its "weighted average percentage price increase justified [by increased non-product costs]" at least 30 days before the effective date of the price increase.[53]

On September 18, 1973 the COLC introduced procedures for "banking" unrecouped product cost increases.[54] Because the initial banking provision created some confusion, it was amended in November 1973 to make clear that if, for any reason, the prices charged for a particular product resulted in revenues insufficient to recoup all product cost increases allocated to that product, the refiner could bank the unrecouped costs for use in computing base prices for a subsequent month.[55] The regulations in effect prior to December 1, 1974 did not state explicitly whether non-product cost increases could be banked.

The only public explanation for the special treatment of refiners' product cost increases in the Phase IV regulations was the following statement contained in a press release issued by Dr. John Dunlop, Chairman of the COLC, on August 10, 1973:

> The Council has been very concerned that the final regulations strike a delicate balance between constraining prices while at the same time encouraging the necessary increase in supplies which the country must have. The Council is aware that energy prices must be allowed to rise in order to stimulate development of new

---

**51.** *See* 6 C.F.R. Part 150, 38 Fed.Reg. 21592 (August 9, 1973). Manufacturers and petroleum refiners alike were subject to similar regulations under Phase II. *See* 6 C.F.R. Part 300 (1972).

**52.** 6 C.F.R. Part 150, Subpart L, 38 Fed.Reg. 22536 (August 22, 1973); *id.* § 150.358(g), 38 Fed.Reg. 22541.

**53.** *Id.* § 150.358(c), 38 Fed.Reg. 22541 (August 22, 1973). Refiners, as well as manufacturers, prenotified their allowable price increases as a "rate" or percentage of the base price. Form CLC-22 was used to prenotify price increases above base price and to justify such increases by way of increased non-product costs. *See* Docket Item 79, exh. C-22. COLC had the authority to defer, delay, modify or disallow prenotified price increases. *See* 6 C.F.R. § 150.358(d), 38 Fed.Reg. 22541 (August 22, 1973); 6 C.F.R. § 150.154, 38 Fed.Reg. 21608 (August 9, 1973).

**54.** 6 C.F.R. § 150.356(c), 38 Fed.Reg. 25688 (September 14, 1973).

**55.** The original banking regulation permitted a refiner that "establishes a base price . . . which does not include the entire amount of increased [product] costs" to bank the unapplied costs. 6 C.F.R. § 150.356(c), 38 Fed.Reg. 25686, 25688 (September 14, 1973). This language implied that a refiner could establish a "base price" which did not include all of the applicable product cost increases. The language of the regulation, as amended on November 2, 1973, does not support such an inference. *See* 6 C.F.R. § 150.356(d), 38 Fed.Reg. 30271 (November 2, 1973). The November amendment expressly permitted banking when underrecoupment of costs resulted from an overestimation of sales volume for the current month—a situation not addressed in the initial banking regulation. *Id.*

energy reserves and make possible the purchase of higher cost foreign oil. At the same time, we must prevent unnecessary price increases.

Docket Item 79, exh. C-5. The COLC especially wanted to avoid price gouging in sales of products like gasoline and heating oil, for which there was high consumer demand and relatively little demand elasticity (i. e., products consumers would buy at almost any price). Therefore, the regulations distinguished between two broad categories of products. The first category, later referred to as "special products," consisted of gasoline and distillates (No. 2 diesel fuel and No. 2 heating oil). The second category included all other covered products and was denominated "covered products other than special products."

By the end of 1973, the COLC had adopted mathematical formulas for allocating both product and non-product cost increases among the various special products and covered products other than special products for purposes of determining prices.[56] The regulations provided general formulas for computing the amount of increased product costs attributable to each of the three product categories.

Under these formulas, the total dollar amount of increased product costs attributable to a particular product category for the current month equaled the sum of four cost components: (1) the increased cost of crude oil allocated to that product category, (2) the increased cost of purchased products of that category, (3) the amount of unrecovered PCI (the "bank"), and (4) the amount of PCI reallocated to products other than special products by the refiner (represented

by the symbol "H"). The formulas allocated the total increased cost of crude oil incurred by a refiner in the month of measurement (represented by the symbol "t") among the three product categories based on the percentage of the total volume of sales in a historical reference period attributable to each category. The "H" factor manifested the COLC's desire to hold down prices on special products. The regulations permitted a refiner to reallocate PCI otherwise attributable to sales of special products to the category of covered products other than special products for the purpose of computing base prices, but not vice versa.[57]

For the two special products, distillates and gasoline (represented by the symbols "i = 1 and 2", respectively), the amount of PCI available for application to prices in the current month (represented by the symbol "u") was divided by the sales volume expected during that month to determine the increment in cents per gallon (represented by the symbol "$D_iu$") which could be added to the May 15, 1973 selling prices of that product to compute base prices. The regulations did not require refiners to convert the total dollar amount of PCI attributable to covered products other than special products (represented by the symbol "$D_iu$") into a cents-per-gallon figure. Instead, the refiners could apportion the total dollar amount of PCI available among the various covered products other than special products (such as residual oil and jet fuel) in whatever amounts they deemed appropriate.[58] A further explanation of the mathematical formulas involved appears in the footnote.[59]

The method for computing non-product cost increases was significantly different.

---

**56.** *See* 6 C.F.R. § 150.356, 38 Fed.Reg. 25686 (September 14, 1973), *as amended in* 38 Fed. Reg. 30270 (November 2, 1973) and 38 Fed.Reg. 33579 (December 6, 1973) (formulas for allocating product cost increases); 6 C.F.R. § 150.355, 38 Fed.Reg. 33578 (December 6, 1973) (formula for allocating non-product cost increases).

**57.** 6 C.F.R. § 150.356(c)(1)(i), 38 Fed.Reg. 33580 (December 6, 1973).

**58.** 6 C.F.R. § 150.356(c)(2), 38 Fed.Reg. 33580 (December 6, 1973).

**59.** The FEA provided the following description of the formula for computing $d_iu$ when gasoline is the special product being considered:

First, a refiner determined the percentage rate of increase in non-product costs from the base period to the current period.[60] This figure was then converted into a percentage price increase justified by non-product cost increases,[61] which, if approved upon prenotification, could be used to increase prices above base prices throughout the consecutive 12-month period, provided the increased non-product costs continued to be incurred. As in the case of PCI, the regulations required refiners to convert the percentage price increase into a cents-per-gallon figure for each of the special products.[62] The computed price increment could be added to base prices in each of the following 12 months.

For covered products other than special products, however, refiners had to compute only the total dollar amount available for addition to base prices in the consecutive 12-month period as a result of increased non-product costs.[63] The regulations afforded refiners broad discretion in deciding which products in the "other covered products" category should bear the price increases and, more importantly for purposes of the instant litigation, how much of the increased costs should be passed through in any one month.[64] The only limitation on this flexibility was the requirement that "for any fiscal quarter, the weighted average of all price increases . . . in [that product category] . . . not exceed the percentage of cost justification." [65]

On January 14, 1974, the FEO recodified and renumbered the COLC's Phase IV petroleum price regulations.[66] Sections 150.-355 and 150.356 of the Phase IV regulations

$$d_i u = \frac{At(V_i n)}{(Vn)} + B_i t + G_i t - H_i u$$

| $d_i u$ = | $\frac{At(V_i n)}{(Vn)}$ = | $+ B_i t$ | $+ G_i t$ | $- H_i u$ |
|---|---|---|---|---|
| The dollar increase which may be applied in the current month ("u") to the May 15, 1973 selling price of gasoline ("i") to compute the base price of gasoline to each class of purchaser | Total increased cost of crude oil incurred in the month of measurement allocable to gasoline | Total increased costs of gasoline purchased or landed in the month of measurement | Total increased product costs allocable to gasoline not recouped in sales of gasoline through the month of measurement | Increased product costs allocable to gasoline which the refiner chooses to allocate to other covered products |

$$V_i\, u$$

The volume of gasoline which the refiner estimates it will sell in the current month.

The formula for "$D_i u$" is essentially the same as the above formula except that it does not have the divisor "$V_i u$".

**60.** Increases in non-product costs had to be reduced to reflect productivity gains. 6 C.F.R. § 150.355(f), 38 Fed.Reg. 33579 (December 6, 1973). The "current cost" period was the last accounting month preceding the date the refiner signed the prenotification form in question. *See* Revised Instructions for Form CLC-22, Schedule C, Docket Item 79, exh. C-22.

**61.** *See* Revised Instructions for Form CLC-22, Schedule C, Docket Item 79, exh. C-22, line 12.

**62.** 6 C.F.R. § 150.355(d)(3)(i), 38 Fed.Reg. 33578 (December 6, 1973).

**63.** *Id.* § 150.355(d)(3)(ii), 38 Fed.Reg. at 33578.

**64.** The regulations also seem to have permitted refiners to reallocate non-product cost increases attributable to special products to covered products other than special products. *See id.* § 150.355(d)(2)(ii), 38 Fed.Reg. at 33578.

**65.** *Id.* § 150.355(e), 38 Fed.Reg. at 33579.

**66.** 39 Fed.Reg. 1924 (January 15, 1974).

were recodified at 10 C.F.R. §§ 212.82 and 212.83, respectively. No other changes material to this litigation were made before the relevant period.

### 1. The Base Price Rule

■ The FEA contends that permitting refiners to recover their increased product and non-product costs proportionately, as the plaintiffs did here, would contravene the "base price/price in excess of base price" rule. This rule enabled refiners to pass through product cost increases automatically and permitted them to increase prices above base prices only in order to pass through increased non-product costs.[67] According to the FEA, the base price rule imposed a sequence for including costs in the calculation of the maximum allowable price—May 15, 1973 selling prices, first, *all* PCI second, and NPCI third. The FEA further contends that refiners should have inferred the NPCI Last method of cost recovery from this pricing sequence.

The FEA's arguments rest on two important premises, both of which the plaintiffs have challenged: (1) that the base price is "fixed",[68] that is, for a particular product and class of purchaser in a given month the base price is equal to the May 15, 1973 selling price plus *all* product cost increases allocated to that product; and (2) that the base price rule establishes a sequence for determining prices which also governs the recovery of costs from revenues at the end of the month.

As the court observed in *Standard Oil II,*[69] the FEA must establish the validity of both of the above premises in order to make out its "base price" argument. In *Standard Oil II* Judge Manos considered the fixed base price issue and held that the regulations did *not* "require refiners to include *all product costs* in their base prices before they could apply increased non-product costs over their base price[s]."[70] For the reasons discussed below, this Court has concluded that the base price rule, regardless of whether base price is fixed or flexible, does not require the use of a particular method or sequence of cost recovery. Accordingly, the Court finds it unnecessary to consider the first of the two above-mentioned premises and assumes arguendo that base price is fixed.

■ Turning to the issue of whether the "base price/price in excess of base price" rule established a sequence for the recovery

67. *See* 10 C.F.R. §§ 212.82(b), (c), 39 Fed.Reg. 1952, 1953 (January 15, 1974). A refiner that charged a price in excess of base price in any fiscal year could not exceed its base period profit margin in that year. *Id.* § 212.82(i), 39 Fed.Reg. at 1954.

68. According to the plaintiffs, base price is flexible and may be set at any price between the May 15, 1973 selling price and the sum of that price and all product cost increases allocated to the product being considered. Under this interpretation, a refiner that sold gasoline on May 15, 1973 at $.30 per gallon and had incurred product cost increases justifying a $.20 per gallon price increment, could establish a "base price" of $.35 per gallon, "bank" any PCI not recovered as a result, and also add on any NPCI-based price increment that had been prenotified to the agency. In the example, the fixed base price interpretation advanced by the FEA would have prohibited the inclusion of an NPCI-based increment in the selling price, because such an increment could only be added to the base price ($.50) and that had not yet been reached.

The Court notes that the language of the regulations is ambiguous on this issue. For example, the regulations, throughout the relevant period, defined "base price" generally as the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, *plus increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 212.83.* 10 C.F.R. § 212.82(b), 39 Fed.Reg. 42369 (December 5, 1974) (emphasis added); *see* 10 C.F.R. § 212.82(f), 39 Fed.Reg. 1953 (January 15, 1974). Although the definition seems to support a fixed base price concept, the language in section 212.83(c)(2) defining "d₁u" as "[t]he dollar increase that *may be applied . . . to the May 15, 1973 selling price . . . to compute the base prices"* provides, at least, equal support for the opposite inference. 39 Fed.Reg. 42370 (December 5, 1974); *id.* at 1955 (January 15, 1974).

69. *Standard Oil Co. v. FEA (Standard Oil II),* Case No. C76–1279 (N.D.Ohio, January 20, 1978) (slip op. at 34–46).

70. *Id.* slip op. at 46.

of increased product and non-product costs, the Court notes first that there is absolutely no indication in the regulations that the base price concept applies to anything other than pricing. From the inception of the Phase IV petroleum price regulations [71] until the end of the relevant period on February 1, 1976, the pertinent provision of the regulations provided in effect:

> (c) *Allowable price in excess of the base price.* A refiner *may only charge* a price in excess of the base price of a covered product in order to recover on a dollar-for-dollar basis increased non-product costs incurred between the month of measurement and the month of May 1973. . . . [72]

The clear intent of this regulation is to keep prices down. It explicitly prohibits a refiner from implementing a price increase for any reason other than to recoup increased costs, but it does *not* address the issue of cost recovery. Contrary to the repeated assertions of the FEA's counsel at oral argument, the above-quoted regulation does not say to refiners: "If you charged a price in excess of the base price at the beginning of the month, you could recover non-product costs [at the end of the month]. *If you did not, you could not.*" [73] Indeed, the FEA admits that a refiner that received revenues sufficient to recover more than all of its available PCI could have applied the excess to the recoupment of NPCI, even if the selling price had been below the base price. [74]

The official communications and decisions cited by the FEA as evidence that it contemporaneously construed the base price regulations to require use of the NPCI Last method of cost recovery are equally unpersuasive. The strongest support for the FEA's position appears to be the so-called "Gulf Appeal," which concerned a two-sentence proviso the FEA included in several orders approving prenotified refiner price increases in the latter part of 1974. [75] The first sentence of the proviso merely stated FEA's position that the base price is fixed; it clearly related only to pricing. The second sentence virtually defies comprehension and the Court will not hazard a guess about its meaning.

Gulf received a prenotification decision and order containing a similar proviso on October 18, 1974 and immediately asked for an explanation. An FEA official apparently advised Gulf that all product cost increases, including banked PCI, had to be recovered before any non-product cost increases could be recovered. [76] Asserting

---

71. *See* 6 C.F.R. § 150.358(b), 38 Fed.Reg. 22541 (August 22, 1973).

72. *See* 10 C.F.R. § 212.82(c) (1976).

73. Transcript of Oral Argument ("T."), Docket Item 100, at 42 (emphasis supplied); *id.* at 38–40, 49.

74. Opening Memorandum in Support of Defendant's Motion for Summary Judgment, Docket Item 80, p. 96; Docket Item 99, Att. LL, Case No. 4.

75. Gulf Oil Corp., 2 FEA ¶ 80,552, CCH Energy Management (March 21, 1975). The proviso read as follows:

> No part of the increase above base prices of covered products authorized by this Order may be applied to the price of a covered product below the base price. In applying any permitted increase above a base price, no part of the increment so applied may be used to support a calculation permitted or required by § 212.83.

Docket Item 88, p. 214 (Att. S).

76. In its appeal memorandum Gulf stated that Thomas Musico of the FEA had advised it that the proviso required non-product cost increases to be recovered last. Docket Item 87, p. 217 (Att. T, p. 2). Mr. Musico recalled having informed Gulf that the proviso meant "all available increased product costs including banked product costs had to be passed through first in the base price of a covered product before any approved prenotified nonproduct cost increases in excess of the base price could be applied." Affidavit of Thomas F. Musico, par. 7, Docket Item 87, p. 150.

The latter statement embodies the fixed base price concept, which this Court has assumed to be correct; it does not preclude the use of the proportional method of recovery when, for example, a refiner that properly charged a price in excess of the base price overestimated its sales volume for the current month and consequently could not recover all its cost increases. In such a situation, the proportional method of cost recovery described in note 28, *supra,* is perfectly consistent with the fixed base price concept.

that the regulations did not require such a sequence of recovery, Gulf appealed. In the instant litigation the FEA quoted at length from Gulf's appeal memorandum, which clearly challenged the NPCI Last method and requested that the proviso be deleted from the prenotification order. The defendants herein cite the FEA's refusal to delete the proviso as evidence of the FEA's interpretation of the regulations to require use of the NPCI Last method.

An examination of the FEA's decision on the Gulf appeal, however, reveals that the agency never explicitly addressed the method of cost recovery. The FEA held "there is no merit to Gulf's contention that Section 212.82 does not authorize the provision of the . . . Order which prohibits Gulf from applying any portion of the price increase authorized by the Order to any covered product which is being sold below base price levels."[77] In other words, the FEA upheld the fixed base price concept and, because the proviso embodied that concept, the FEA refused to delete it from the prenotification Order. Similarly, the language quoted by the defendants from the decision on the Gulf appeal merely restates the agency's interpretation of base price as fixed[78]—an interpretation this Court has assumed to be valid. The fact that the

FEA must resort to quoting the arguments presented to it by a refiner in order to find express support for its argument that the sequence for setting prices established by the base price rule also governs the sequence of cost recovery further demonstrates the weakness of its position.

### 2. The PCI Banking Provision

■ Another basis advanced by the FEA for inferring a requirement that non-product costs be recovered last is the banking provision contained in section 212.83 prior to the relevant period. The FEA contends the computational requirements of section 212.83, as implemented by Form FEO-96[79] and the instructions thereto, cannot be squared with any recovery method other than the NPCI Last method. Section 212.-83(d) authorized banking of PCI, whenever the prices charged "result[ed] in the recoupment of less total revenues than the entire amount of increased product costs calculated for that product." 39 Fed.Reg. 1956 (January 15, 1974). The instructions to Form FEO-96 directed refiners to compute the "bank" for each product category by subtracting "*the total amount of revenues received, during the Period of Measurement, in excess of the May 15, 1973 selling*

---

Mr. Musico has stated that he specifically advised the Shell Oil Company that all PCI had to be recovered first. Musico also stated that on February 5, 1975 he told Shell's representatives that if they disagreed with his understanding of the regulations "they should seek an interpretation from other FEA officials." Musico Aff'd, par. 8, Docket Item 87, p. 152.

77. Gulf Oil Corp., *supra*, 2 FEA ¶ 80,552. Even this conclusion has only marginal relevance to the issues presented by these cases, for, as the Court noted in *Standard Oil II*, *supra*, the *Gulf* "decision was *explicitly* restricted to the application of the regulations '*prior to their revision*,' *i. e.*, prior to the time frame January 1, 1975 through January 31, 1976." Slip op. at 55 (emphasis original).

78. The language from the Gulf Appeal cited by the FEA is as follows:

The Federal Energy Administration has considered the arguments advanced by Gulf in its appeal and has concluded that there is no merit to Gulf's contention that Section 212.82 does not authorize the provision of the October 18, 1974 Order which prohibits Gulf from

applying any portion of the price increase authorized by the Order to any covered product which is being sold below base price levels.

\* \* \* \* \* \*

The provisions of Section 212.82 cited above clearly specify that allowable non-product cost increases prenotified pursuant to 10 C.F.R. 212, Subpart I are to be applied to base prices. . . .
*Because allowable, prenotified non-product cost increases are to be applied to base prices and base price by definition includes increased product costs, it is clear that under the provisions of Section 212.82, prior to their revision, Gulf could not use the price increase authorized by the Order to increase the price of any covered product which was then being sold below base price levels.*
Opening Brief in Support of Defendant's Motion for Summary Judgment, Docket Item 80, p. 45 (emphasis in original).

79. Docket Item 87, p. 236 (Att. V). The form is entitled "Monthly Cost Allocation Report."

*prices*" of products in that category *from* "the total number of dollars of increased [product] costs which were attributable to [that product category] and available for recovery in the Period of Measurement."[80] Neither the regulations nor the instructions to Form FEO-96 specified a method for computing the amount of non-product cost increases recovered each month.

The FEA interprets the above mentioned provisions to require a refiner charging a price above base price to apply all revenues received in excess of the May 15, 1973 selling price toward the recovery of available product cost increases before applying any portion of those revenues toward the recovery of non-product cost increases. Thus, under the FEA's interpretation, a refiner that (1) had a total of $1,000,000 in PCI available for recovery in the current month, (2) had $200,000 in approved prenotified NPCI, (3) had established a selling price at the beginning of the current month which included all those costs, and (4) as a result, had received revenues in excess of the May 15, 1973 selling price totaling $1,100,000, would recover all $1,000,000 of its PCI and $100,000 of the available NPCI. As the plaintiffs point out, however, the computations required by section 212.83(d) and the instructions to Form FEO-96 yield no NPCI recovery in the situation posited above; instead, they produce a PCI overrecovery of $100,000, which would have to be subtracted from the May 15, 1973 selling price to compute the base prices for the subsequent month. The FEA deftly avoids this anomalous result by construing the silence of the regulations concerning the recovery of NPCI to mean that such costs must be recovered last. As is demonstrated below with respect to the issue of NPCI banking prior to the relevant period, an equally plausible explanation for the absence of any reference to NPCI recovery is that the methods of handling PCI and NPCI during the prenotification period were conceptually so different that there was no need to discuss recovery of NPCI. The same sort of imprecision evident in the use of "total revenues" in section 212.83(d) instead of "total revenues in excess of May 15, 1973 selling price" may have existed in the instructions to Form FEO-96; that is, the latter term may have been intended to include only those revenues generated by the price increment based on product cost increases. The point is the agency's silence on the method of cost recovery is ambiguous. Thus, the banking provision and Form FEO-96 do not require use of the NPCI Last method.

### 3. *The Prohibition Against Banking Non-Product Cost Increases*

■ Finally, the defendant asserts that use of the proportional method of recovery would contravene the prohibition against the banking of non-product cost increases. The FEA contends the banking prohibition was implicit in the regulatory scheme in effect during the prenotification period. For the reasons given below, the Court disagrees.

Before December 1974, the methodologies used to compute and pass through product and non-product cost increases were qualitatively different. Non-product cost increases were computed in terms of the "rate of increase" of such costs in the month preceding prenotification over the same costs incurred during a historical base period. These rates of cost increases were converted into "weighted average percentage price increases," which, if approved after prenotification, could be added to base prices throughout the consecutive twelve-month period. 10 C.R.F. § 212.82(b), (c), 39 Fed.Reg. 1952–53 (January 15, 1974). Under this system, the FEA in effect used the rate of increase in non-product costs as an indicator or forecast of the level of non-product costs in the succeeding twelve-

---

**80.** *See* Docket Item 87, pp. 244, 245, 247 (Att. W). Although the term "total revenues" in section 212.83(d) could have been construed literally to include revenues derived from the portion of the selling prices reflecting May 15, 1973 prices, the instructions to Form FEO-96 precluded that construction. The method for computing the PCI "bank" (represented by the symbol "G") is expressed as a mathematical formula in section 212.83(c)(2), 39 Fed.Reg. 1956 (January 15, 1974).

month period. This is particularly evident in the provision that makes the application of an approved prenotified price increase contingent upon whether the refiner continues to incur the prenotified non-product cost increases. *Id.* § 212.82(b), (d).

In contrast, the method for computing price increases based on product cost increases, which has been referred to as the "dollar-cost pool" method, operated retrospectively. At the beginning of each month, refiners determined the total amount of PCI available for pass-through that month by adding the amount of PCI incurred in the preceding month to the amount of previously incurred but as yet unrecovered PCI. The refiners then could increase their prices for the current month by an amount calculated to permit recovery of all or some portion of the product cost pool allocated to each of the three product categories. If the additional revenues resulting from the price increases above the May 15, 1973 selling prices were not sufficient to recoup all the available PCI, the unrecovered costs could be "banked" for inclusion in the cost pool for the following month.

Banking served two purposes in the dollar-cost pool methodology: (1) it provided pricing flexibility by enabling refiners to pass through less than all their available PCI in the current month without forfeiting the right to pass through the remainder later; (2) it provided a mechanism to control the effect of errors in estimating sales volumes.

The FEA contends the regulations implicitly prohibited the banking of NPCI, because the rate of increase method contained nothing analogous to banking and the regulations expressly provided for banking only with respect to PCI. The Court finds the first reason unpersuasive because the regu-

lations governing NPCI contained provisions that to a large extent fulfilled the same purposes as banking did with respect to PCI. The FEA has admitted that, at least as to covered products other than special products,[81] the regulations did permit refiners to forego charging a prenotified price increase in one month and still recover the underlying non-product cost increases by adding a greater price increment in another month in the same fiscal quarter.[82] The banking provision protected against overrecoveries of PCI due to underestimation of sales volume by requiring refiners to subtract the amount of any overrecovery from the following month's cost pool.[83] The requirement that refiners continue to incur prenotified non-product cost increases during the effective period of an approved price increase served the same purpose. Approval of a prenotified price increase above the base price meant that the refiner could increase its selling prices by the prenotified amount in each of the following twelve months regardless of whether additional revenues in any particular month were less than or greater than the NPCI incurred.

Likewise, the Court does not consider the silence of the regulations concerning NPCI banking indicative of an intent to prohibit such banking. More probably, it reflects the fact that the concept of banking with the requisite matching of previously incurred costs against revenues has no place in the prospectively applied "rate-of-increase" scheme for passing through increased non-product costs. Viewed in this light, the failure to provide for NPCI banking while, at the same time, permitting PCI banking, reasonably can be construed as meaning that the agency has taken no position on the issue of NPCI banking whatsoever.[84] Thus, the absence of a provision

**81.** *See* notes 60–65 *supra* and accompanying text.

**82.** Reply Memorandum in Support of Defendant's Motion for Summary Judgment, Docket Item 94, pp. 52–53; *see* Wilson Dep., Docket Item 75B, pp. 36–39; Docket Item 79, exh. D–1.

**83.** 10 C.F.R. § 212.83(d), 39 Fed.Reg. 1956 (January 15, 1974).

**84.** This conclusion is buttressed by the deposition testimony of David Wilson, who was Associate General Counsel for Price with the COLC in 1973 and participated in the development of the Phase IV price regulations, in response to a

authorizing NPCI banking is ambiguous at best.

In summary, the FEA has failed to establish that the regulations in effect prior to the relevant period implicitly required use of a non-product cost last method of recovery. The "base price/price in excess of base price" rule and the formulas pertaining to the banking of product cost increases do not necessarily preclude the application of alternative methods of cost recovery, such as the proportional method. Further, the Court concludes the regulations in effect during the prenotification period did not prohibit, implicitly or otherwise, the banking of non-product cost increases.

## B. Regulations Affecting Prices During the Relevant Period.

On September 10, 1974 the FEA issued a notice of proposed rulemaking announcing the "first proposed comprehensive revision" of the petroleum price regulations since the end of 1973.[85] Regarding the pass-through of non-product cost increases, the FEA proposed to eliminate the "prenotification" procedure and to replace it with an automatic pass-through for certain increased non-product costs on a basis which retained the profit margin limitation on the pass-

through of such costs, but which was otherwise similar to the procedure used for the pass-through of increased product costs.[86] In the same notice, the FEA proposed to limit the extent to which refiners could pass through banked product cost increases in subsequent months.

On November 1, 1974,[87] the FEA adopted final amendments to the banking regulations. The regulations, as amended, limited the amount of banked increased product costs that could be passed through in any month to ten percent of the total amount of the bank.

One month later the FEA adopted with a few modifications the amendments relating to the pass-through of non-product cost increases that had been set forth in the September 10, 1974 notice. The amendments became effective on December 1, 1974, but because they provided for a 30-day lag in the recovery of all costs, the amendments did not affect prices until January 1, 1975. The new regulations lessened the differences in the handling of product and non-product cost increases. Besides deleting the prenotification procedure, the FEA eliminated the "rate-of-increase" method of computing NPCI and required refiners to calcu-

---

question concerning his failure to focus on the order of recoupment in developing the petroleum price regulations:

> One of the problems in this during this prenotification period and prior to the changes that occurred in December of 1974, there are essentially two different methodologies that were involved. There was the formula that we had adopted, that the Cost of Living Council had adopted with respect to increased product costs, which was set forth in the regulations, which provided for a *total cost pool concept* in which increased costs were determined. You had a pool which then could be recouped in a particular period of time. If not recouped in that period of time, it could be carried forward for recoupment later on. To the extent those costs, plus the May 15th, 1973, price comprised the base price; to the extent to which there are charges above base price, which would involve all other costs which were later deemed non-product costs, a pre-notification was required in the same manner as the General Phase IV Regulations required pre-notification.

> The pre-notification procedures and the methodology for calculating those was an entirely different concept, which was more of a rate basis concept. It was developed in conjunction with manufacturing and similar types of economic activity. It looked to factors such as increases in rates of labor costs per hour, such as if your labor cost went up from $2.25 to $2.50 per hour, you were then allowed to start reflecting those costs at a higher rate.

> There was no concept in those regulations and procedures as well as the forms associated with them, to my knowledge, of a cost pool where the costs that were not recovered in a given time were able to be used as cost justification at a later date to justify a higher price. Therefore, this issue was basically never addressed at that time.

Wilson Dep., Docket Item 75B, pp. 41–43 (emphasis supplied).

**85.** 39 Fed.Reg. 32721 (September 10, 1974).

**86.** *Id.*

**87.** 39 Fed.Reg. 39259 (November 6, 1974).

late product and non-product cost increases using the same "dollar amount" or "dollar cost pool" method. 39 Fed.Reg. 42368 (December 5, 1974). The agency adopted several of the other proposed amendments at the same time, including a new section (10 C.F.R. § 212.87), which defined the categories of increased non-product costs that a refiner could pass through.[88] Finally, the December 1, 1974 rulemaking contained a provision which had not been set forth explicitly in the notice of proposed rulemaking; this provision expressly prohibited the banking of NPCI.[89]

The other regulations affecting the pass-through of non-product cost increases remained unchanged. The FEA retained the base price rule and the requirement that a price in excess of the base price be charged only "in order to recover on a dollar-for-dollar basis increased non-product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 212.87."[90]

The regulations, as amended, still subjected a refiner that charged a price in excess of the base price to the profit margin limitation.[91]

█ The December 1, 1974 regulations, like those in effect during the prenotification period, contained no explicit provision specifying a method for allocating product and non-product cost recoveries. The FEA, relying on the same three regulatory provisions discussed earlier in relation to the prenotification period, contends the regulations as amended required use of the NPCI Last method. This argument appears to have two distinct bases: (1) that the regulatory scheme implicitly requires refiners to recover non-product cost increases last and (2) that the FEA so interpreted the regulations during the relevant period. To establish the first proposition the FEA must show the NPCI Last requirement is the only reasonable interpretation which the language of the regulations will bear.[92]

88. 39 Fed.Reg. 42368, 42373–74 (December 5, 1974); *id.* at 32729–30 (September 10, 1974). For a list of the cost categories included in the definition of increased non-product costs, *see* note 24 *supra.* Another amendment adopted in December 1974 clarified the classification of refinery fuel cost. Before December 1, 1974, refiners could treat the cost of crude oil used as refinery fuel as either a product or a non-product cost, because the regulations were unclear on this point. The December 1974 amendments required refiners to treat such crude oil costs as a non-product cost. 10 C.F.R. § 212.-87(c)(1), 39 Fed.Reg. at 42368–69, 42373.

When the FEA proposed this clarification in the September 10, 1974 notice, it recognized that refinery fuel cost was an "important cost item." Nevertheless, the agency suggested that the elimination of the prenotification requirement for NPCI rendered the reclassification relatively inconsequential, stating:

The changes in procedures with respect to the pass-through of non-product cost increases proposed in this notice will permit refiners generally to pass through such increased costs of refinery fuels, subject to a profit margin limitation.

39 Fed.Reg. at 32725. In *Standard Oil II, supra,* the Court considered the FEA's failure to mention any other impediments to the recovery of refinery fuel costs as a result of the reclassification "compelling evidence" of the non-existence of any unarticulated requirement that non-product cost increases be recovered last. *Standard Oil II, supra,* slip op. at 59–60.

89. The banking prohibition provided:

(4) Increased non-product costs calculated pursuant to § 212.87 for the month of measurement which are not recouped in the current month (which is the month immediately succeeding that month of measurement) may not be carried forward for use in computing allowable prices in excess of base prices in any subsequent month. If the allowable prices in excess of base prices charged in a current month result in the recoupment of more than the total amount of increased non-product costs for the month of measurement (the month immediately preceding that current month), the amount of such overrecoupment shall be subtracted from the amount of increased product cost which would otherwise be available in the subsequent month for allocation to base prices of the product or products with respect to which the overrecoupment of increased non-product costs occurred.

10 C.F.R. § 212.83(e)(4), 39 Fed.Reg. at 42372. The preamble to the rulemaking did not state the purpose of the new regulation.

90. *Id.* § 212.82(c), 39 Fed.Reg. at 42369.

91. *Id.* § 212.82(d).

92. *See Sampson v. Clark,* 162 F.2d 730, 733, 735–36 (Em.App.1947); *cf. United States v. Chicago Blackhawk Hockey Team, Inc.,* 468 F.2d 221 (T.E.C.A.1972) (court refused to imply an exemption to a clear regulatory provision,

This subsumes a secondary issue in these cases, viz., whether the regulations reasonably could be construed to permit use of the proportional method of recovery. If the regulations do not compel use of the NPCI Last method, the Court must examine the FEA's contemporaneous construction of the regulation for guidance in resolving the resultant ambiguity.[93] For the Supreme Court has held that in interpreting "an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). In examining the regulatory scheme and the FEA's contemporaneous construction of it, the Court adopts the viewpoint taken by the Second Circuit in *Tobin v. Edward S. Wagner Co.,* 187 F.2d 977 (C.A. 2, 1951), that:

> "regulations, precisely because they particularize, ought not be as generously interpreted as the statute. In fairness to the regulated, the provisions of the regulations should not be deemed to include what the administrator, exercising his delegated power, might have covered but did not cover. True, in deciding what they do cover, we must not regard their literal terms merely, but must also give much weight to administrative interpretive rulings which have been published and of which the regulated are thus on notice."

*Id.* at 979, quoted in *Standard Oil II, supra,* slip op. at 66.

■ Having concluded the regulations in effect during the prenotification period contained no implicit NPCI Last requirement, the Court need only consider whether the December 1, 1974 amendments to the regulatory scheme give rise to such an implication. The FEA made three changes relevant to this litigation: (1) the elimination of the prenotification procedure, (2) the change from a "rate of increase" to a "dollar cost pool" method of calculation, and (3) the prohibition of non-product cost banking. The agency described these changes as procedural and emphasized its intent to conform the procedures for handling NPCI to those for PCI, "while retaining the essential substantive features of the [pre-existing] non-product cost pass-through regulations." 39 Fed.Reg. 32721 (September 10, 1974). The only restriction that the agency cited as applying to the pass-through of NPCI but not of PCI was the profit margin limitation. *Id.* at 32721. The profit margin limitation by its terms applied only to firms which charged prices in excess of the base prices at any time during a fiscal year;[94] like the base price rule, it did not impose a sequence of cost recovery. In light of the minimal substantive significance the FEA attached to the elimination of the prenotification procedure and the changeover to a "dollar cost pool" method for calculating NPCI, it is highly unlikely that a refiner would have inferred an NPCI Last requirement from either or both of those changes. *See Standard Oil II, supra,* slip op. at 58–59. The contrast between the total absence of comment on the method of cost recovery prior to the adoption of the December 1974 amendments[95] and the outcry from refiners in February 1976 when the FEA publicly announced that it interpreted the regulations to require non-product cost increases to be recovered last attests to the validity of this conclusion.

Because the amendments required both product and non-product cost increases to be computed and passed through on a dollar

---

even though the absence of an exemption may have led to an unintended result).

**93.** Neither party has suggested the regulations implicitly required use of a method of recovery other than the NPCI Last method. The Court understands the plaintiffs to argue that the regulations themselves are ambiguous as to the proper method for allocating cost recoveries and that upon that premise the Court should defer to the alleged agency interpretation requiring use of the proportional method.

**94.** 10 C.F.R. § 212.82(d), 39 Fed.Reg. 42369 (December 5, 1974).

**95.** Luedtke Dep., Docket Item 73A, pp. 119, 121–22; *Affidavit of Thomas Eastment,* Docket Item 79, exh. B–21.

cost pool basis, the reasons for rejecting the FEA's argument that the banking provision and the instructions to Form FEO–96 implicitly imposed a sequence of recovery must also be reconsidered. Aside from the prohibition against NPCI banking, the December 1974 regulations do not mention the recovery of non-product cost increases. The FEA did promise to issue a new Form FEA–96 to replace the old Forms FEO–96 and CLC–22,[96] but it did not adopt a new form until after the relevant period had ended. A proposed revision of Form FEO–96 was issued in April 1975, but it provided no guidance concerning the proper method for recovering non-product costs.[97] Indeed, the record indicates that the failure to adopt a final revision of FEO–96 may have been due in part to the comments received from refiners demanding clarification[98] of the sequence of recovery and the inability of the FEA's Office of Compliance and Office of General Counsel to resolve their differences on that issue.[99] Because the FEA did not revise either the regulations or Form FEO–96 to reflect clearly that non-product costs were to be recovered last, the Court finds no reason to alter its conclusion that no such requirement is implicit in either the banking provision or the instructions to Form FEO–96.

· The prohibition against NPCI banking represents the only substantive amendment to the regulations governing non-product costs adopted in December 1974. The FEA argues that to permit recoveries to be computed using any method· other than the NPCI Last method would allow refiners, in effect, to bank non-product costs, thereby rendering the banking prohibition a nullity. The Court disagrees. The regulation provides in pertinent part:

> (4) Increased non-product costs calculated pursuant to § 212.87 for the month of measurement which are not recouped in

the current month . . . may not be carried forward for use in computing allowable prices in excess of base prices in any subsequent month.

10 C.F.R. § 212.83(e)(4), 39 Fed.Reg. 42372 (December 5, 1974). Nothing in this provision addresses the method of cost recovery. Situations in which at least some non-product costs could be recovered before all product costs had been recovered come readily to mind. For example, under the proportional method, a refiner that incurred $100,-000 in NPCI and $900,000 in PCI in the month of measurement, but received revenues in excess of the May 15, 1973 selling prices of only $700,000 in the current month, would deem ten percent or $70,000 of the $700,000 to represent the recoupment of its NPCI and ninety percent or $630,000 to be the recoupment of its PCI. The refiner could bank the $270,000 in unrecovered product cost increases but would lose forever the $30,000 in unrecovered non-product cost increases. This result does not contravene the manifest intent or the express language of the regulation prohibiting refiners from carrying forward unrecouped NPCI.

In addition, the Court notes that the FEA adopted section 212.83(e)(4) without providing any explicit notice or any explanation of its purpose. In such circumstances, the Court is not disposed to stretch the language of the banking prohibition and the other regulations cited by the FEA to obtain a construction which would require use of the NPCI Last method.

This case is very similar to *Sampson v. Clark*, 162 F.2d 730 (Em.App.1947), which involved the application of the Office of Price Administration's ("OPA") maximum allowable price regulations to the plaintiff, a "new manufacturer." The regulations required manufacturers to compute a maximum price which in turn necessitated deter-

---

**96.** 39 Fed.Reg. 32721 (September 10, 1974).

**97.** The proposed form was called Form FEA–P110–M–1. *See* 40 Fed.Reg. 19120 (May 1, 1975); Docket Item 79, exh. A–24, doc. no. 185 NR, par. 6.

**98.** *E.g.,* Letter from Plaintiff Continental Oil Co. to FEA, dated May 12, 1975, Docket Item 79, exh. B–2, p. 2 (Att. D to Affidavit of F. Leon Hayes).

**99.** *See* notes 132–34 *infra* and accompanying text.

mination of direct labor costs. The regulations provided: " 'Direct labor costs' shall be calculated on the basis of wage rates paid by you on March 31, 1942." The plaintiff was not in business on that date; therefore, he argued the maximum price regulations, which failed to indicate the method for computing wage rates in such circumstances, did not apply to him. *Id.* at 732–33. An OPA Board of Review held against the plaintiff because "[t]he structure of the regulation . . . certainly afforded [him] *a rather direct clue* to the prices which he might assume would be valid." *Id.* at 733 (emphasis supplied). The Administrator admitted the existence of "some indefiniteness as to the method of determining wage rates," but nevertheless upheld the Board, stating the plaintiff had a duty to seek a clarification from the OPA with regard to any doubts he had as to the meaning of the regulations. *Id.* at 733.

The OPA's argument in *Sampson v. Clark* bears a striking resemblance to the argument advanced by the FEA in these cases. The Emergency Court of Appeals, however, rejected the OPA's position and held the regulatory scheme, even though clearly intended to include new manufacturers, like the plaintiff, did not apply because the regulations furnished no standard by which new manufacturers could calculate wage rates. *Id.* at 735. In the instant case, the regulations do not clearly prescribe any method for determining cost recoveries. The FEA argues that the "base price/price in excess of base price" rule, the PCI banking provision, and the prohibition against banking NPCI, when taken together preclude the use of any method of recovery other than the NPCI Last method. The agency easily could have spelled out a sequence of recovery through an amendment to the regulations or perhaps through a ruling or an official interpretation during the relevant period. It would be inappropriate for this Court to infer an NPCI Last rule from the several regulations collectively relied upon by the FEA. The foundation

is too tenuous to support a rule having so substantial an impact on the firms regulated.

This conclusion does not mean, however, that the agency could not reasonably have construed the regulations to require use of the NPCI Last method. Because the plaintiffs seek a declaration that the regulations required or permitted use of the proportional method, the Court must consider two further questions: (1) whether the FEA interpreted the regulations in effect during the relevant period to require that non-product cost increases be recovered last; and if not, (2) whether an interpretation which would permit costs to be recovered proportionally is reasonable and consistent with the language of the regulations. Based on the record of contemporaneous construction in these cases, the Court concludes that both issues must be resolved in the plaintiffs' favor.[100]

## C. *Contemporaneous Constructions of the Regulations.*

■ When faced with regulations whose meaning is ambiguous or uncertain, courts generally place great weight on the interpretations given to those regulations by the officers or agency charged with the responsibility of administering them. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *California Molasses Co. v. California & Hawaiian Sugar Co.,* 551 F.2d 1230, 1232 (T.E.C.A.1977); *University of Southern California v. COLC,* 472 F.2d 1065, 1068 (T.E.C.A.1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). An agency's contemporaneous construction of its own regulations deserves great deference. As Mr. Justice Cardozo said in *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933):

---

**100.** The Court finds it unnecessary to consider the plaintiffs' contention that the FEA construed the regulations in effect during the relevant period to *require* use of the proportional method.

"administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. . . . The practice has peculiar weight when it involves contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." (Citation omitted).

There is a dispute in this case, however, over what, if any, interpretation of the regulations the FEA adopted during the relevant period. The plaintiffs cite numerous public statements by FEA personnel endorsing the proportional method and contend that the FEA construed the regulations in effect during the relevant period to permit use of that method. The FEA attempts to dismiss the pronouncements on which the plaintiffs rely as clearly erroneous and merely the unauthorized and unofficial views of several of the agency auditors. The FEA further avers that it has always interpreted the regulations in effect during the relevant period as impliedly requiring refiners to use the NPCI Last method of cost recovery.

Before reviewing the evidence of the agency's contemporaneous construction of the regulations affecting prices from January 1, 1975 to February 1, 1976, the Court will address the more general objections raised by the FEA concerning the statements made by its auditors and others. First, the agency's argument that only the FEA's General Counsel and his staff had the authority to issue official interpretations of its regulations, does not deprive statements by auditors and other officials of the agency of their value as evidence of contemporaneous construction. This is especially true here because the Court has assumed arguendo that the FEA did not officially interpret the regulations to re-

quire use of the proportional method, and therefore will examine the evidence of contemporaneous construction only to determine whether the FEA construed the regulations during the relevant period to require use of the NPCI Last method and whether the language of the regulations supports an interpretation which would permit use of the proportional method. Given the limited extent of the inquiry, it is clearly appropriate to resort to the experience and informed judgment of auditors, compliance officials, staff attorneys and others within the FEA for guidance. Courts consider contemporaneous expressions of opinion by low-ranking officials highly relevant and material evidence of the general understanding of ambiguous regulatory provisions.[101] For example, in *California Molasses Co. v. California & Hawaiian Sugar Co.,* 551 F.2d 1230 (T.E.C.A.1977), a private party brought an action under Section 210 of the Economic Stabilization Act of 1970 to enforce the Phase IV price regulations against a competitor. The plaintiff challenged the interpretation of the regulations held by the IRS, which at that time had responsibility for effecting compliance with the price regulations. Of particular relevance here, the court in *California Molasses* rejected the plaintiff's argument that "the IRS rulings were routine reviews by local personnel and accordingly were of a type or level not entitled to the deference customarily given to administrative agency determinations." *Id.* at 1235. Noting that the IRS and its agents had "delegated authority and expertise in reviewing price control compliance," the court upheld the IRS determination on the ground that it was a reasonable interpretation of regulations which "were ambiguous at best." *Id.* at 1235, 1239. Similarly, this Court will not discount the importance of statements of the FEA's auditors and compliance officials simply because they were not authorized to issue formal interpretations of the agency's regulations.

---

**101.** *See Borelli v. Reconstruction Finance Corp.,* 196 F.2d 730, 736–37 (Em.App.1952) (court considered statements of local agent of Defense Supplies Corporation in interpreting regulations pertaining to status of complainant

under Emergency Price Control Act); *United States v. Roddey Packing Co.,* 121 F.Supp. 241, 243 (E.D.S.C.1954) (court relied on actions of Office of Price Stabilization agents in interpreting regulations).

Many of the statements supporting the proportional method appeared in instructional materials and manuals prescribing operating procedures for auditors. Deference has been accorded to the views expressed in staff manuals and other guidance issued to an agency's personnel in several cases.[102] A division of the Office of Compliance distributed explanatory material to the FEA's auditors in the field with instructions to use the proportional method until the FEA revised Form FEO-96. The FEA itself recently recognized the importance of such information in disposing of an appeal under the Freedom of Information Act, *Fulbright & Jaworski,* 3 FEA ¶ 80,505 (November 11, 1975). The agency ordered the disclosure of an intra-agency memorandum which "discuss[ed] certain portions of the FEA mandatory price regulations and applie[d] the conclusions reached to specific factual situations." In that case, the FEA's Office of Compliance Policy and Management had circulated the memorandum to its field personnel with instructions to act in accordance with it. This fact caused the FEA to conclude:

"Until modified, the documents therefore constitute the FEA's policy concerning certain questions arising under the Mandatory Petroleum Price Regulations and must be disclosed." *Id.* at p. 80,519.

The only difference between the memorandum at issue in the *Fulbright & Jaworski* appeal and the manuals and notices disseminated to auditors in these cases is that the former originated in the Office of General Counsel instead of the Office of Compliance. While this distinction arguably might affect the extent to which the guidance binds the agency, it does not undermine the probative value of the evidence regarding the general interpretation of the regulations or excuse the agency's failure to modify the allegedly erroneous advice given to the auditors by the Office of Compliance.

In sum, the opinions of the FEA's auditors and compliance officials do not deserve significantly less deference solely because those officials were not authorized to issue binding interpretations of the regulations. The weight afforded each of those judgments

will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.[103]

With these criteria in mind, the Court proceeds to describe some of the statements made during the relevant period.

Shortly after the regulations became effective, three members of the FEA's Refinery Audit and Review Program ("RARP") drafted a document designed to explain to FEA audit teams across the country the non-product cost aspects of the December 1974 amendments.[104] The document, entitled Regulation Change Notice 3–1975–1 ("Change Notice"), was distributed to auditors in the field in January 1975.[105] The Change Notice indicated that product and

---

102. *See, e. g., United States v. Sowul,* 447 F.2d 1103, 1105–06 (C.A.9, 1971), *cert. denied,* 404 U.S. 1023, 92 S.Ct. 698, 30 L.Ed.2d 672 (1972); *Helton v. Mercury Freight Lines, Inc.,* 444 F.2d 365, 368 n. 4 (C.A.5, 1971); *Virginia Hospital Ass'n v. Kenley,* 427 F.Supp. 781, 785–86 (E.D. Va.1977). The fact that most of the statements at issue in the instant case were not published in the Federal Register is immaterial. *See Thomas v. County Office Committee of Cameron County,* 327 F.Supp. 1244, 1253 (S.D.Tex. 1971).

103. *Thomas v. County Office Committee of Cameron County, supra,* 327 F.Supp. at 1253 (quoting from *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

104. FEA Answers to Plaintiffs' Interrogatory 13(a), Docket Item 59; Smith Dep., Docket Item 75A, pp. 268, 272; Dingell Committee Testimony, Docket Item 79, exh. D-6, p. 4. The three auditors who drafted the Change Notice were Andrew Drance, Elliott Cohn and George Phillip White. Affidavit of Andrew Drance, Docket Item 83, par. 6.

105. Docket Item 79, exh. A-3. The Change Notice was inserted in the Compliance Audit Review Division ("CARD") Audit Handbook, a compilation of audit guidance issued by the FEA and maintained on a current basis for easy reference by FEA auditors nationwide. The CARD Audit Handbook was in use from November 1974 until November 1975, when it was replaced by the FEA *Compliance Manual.* Af-

non-product cost increases should be recovered proportionally and provided three concrete examples of the application of the proportional method.[106] Andrew Drance, the principal draftsman of the Change Notice, stated that he and his supervisor, Donald Clyman, believed the intent of section 212.83(d), entitled "Allocation of increased non-product costs," was "to establish a proportional mechanism for the *recovery* of increased product and non-product costs."[107] Both men recognized that section 212.83(d) expressly applied only to the allocation of NPCI at the beginning of the month among the various product categories for purposes of *computing allowable prices in excess of base prices.*[108] The language in the Change Notice directing the use of the proportional method reflected this fact.

> Problem: How are recoveries computed when both PCI and NPCI are included in computing price adjustments to May 15, 1973 selling prices? (*This is not addressed in Section 212.83(d)*).

fidavit of George P. White, Docket Item 87, p. 137, pars. 1–3.

**106.** Docket Item 79, exh. A-3, pp. 2–5. In the draft, the proportional recovery rule was referred to as an "unofficial interpretation." *Id.* exh. A-2, p. 2. No such qualification appeared in the final version. *See id.,* exh. A-3.

**107.** *Id.* par. 7.

**108.** Section 212.83(d) provided in pertinent part:

> (d) *Allocation of increased non-product costs.* In computing allowable prices in excess of base prices for sales of a covered product, a refiner may increase its price above base price to each class of purchaser each month beginning with January 1975 by an amount to reflect the increased non-product costs attributable to sales of covered products in the month of measurement, using the differential between the month of measurement and the month of May, 1973, provided that the total amount of increased non-product costs which can be used in computing allowable prices above base prices is calculated pursuant to § 212.87, and provided that the amount of increased non-product costs included in computing allowable prices above base prices of a particular covered product bears the same ratio to the amount of increased product cost included in the base price of that product as the ratio of the

> Method: The ratio of NPCI to total CI would be used. This maintains the ratio of NPCI to PCI as required by 212.83(d). Docket Item 79, exh. A-3, p. 3 (emphasis supplied).

The RARP auditors decided section 212.83(d) implicitly required use of a proportional method of recovery partly because they perceived a conflict between section 212.83(d) and section 212.87(b), which also seemed to prescribe a method for allocating NPCI among the various product categories for purposes of computing prices in excess of base prices.[109] However, both Mr. Drance and Mr. Clyman also believed a proportional method of recovery was "reasonable as a matter of regulatory policy."[110]

Before he began drafting Change Notice 3–1975–1, Drance contacted Peter Luedtke, then the FEA's Assistant General Counsel for Pricing, to check out the proportional recovery theory.[111] Drance described the ensuing conversation as follows:

> total amount of increased non-product cost computed under § 212.87 for the month of measurement bears to the total amount of increased product cost available for allocation to base prices in the current month. 39 Fed.Reg. 42372 (December 5, 1974). No regulation comparable to this complicated and confusing provision existed during the prenotification period.

**109.** Drance Aff'd, Docket Item 83, par. 7.

**110.** *Id.*

**111.** Drance Aff'd, Docket Item 83, par. 8. At his deposition Mr. Luedtke admitted having a telephone conversation with Drance. He testified:

> Q Do you recall how it came to be that Mr. Drance called you to discuss this matter?
>
> A Mr. Drance called me and as best I can recall said that we had amended the regulations, and that it was essential that they get some guidance out to the auditors with respect to those amendments.
>
> He indicated to me that he wanted to put something out having to do with the section of the regulations that deals with proportionate cost recovery, and told me basically what he wanted to say and I said that sounded all right to me.
>
> Q So Mr. Drance then did specifically indicate that the document he wanted to send out

I briefly explained to Mr. Luedtke that we were going out with advice to the field which essentially specified a proportional recovery of product and non-product costs based upon our understanding of the underlying intent of § 212.83(d). I do not recall the precise words I used to describe our proposed advice or our understanding of § 212.83(d). My recollection is that, after I described our interpretation, he said "that's what it should have said," or words to that effect. It was a very brief conversation. . . .

Drance Aff'd, Docket Item 83, par. 8.

Not surprisingly, Drance thought Luedtke had concurred in RARP's proportional recovery theory.[112]

Attached to the Change Notice distributed to auditors nationwide on January 17, 1975 was a set of worksheets entitled Non-Product Cost Increase Schedule ("NPCI Schedule"),[113] which set forth in detail the procedure for calculating cost recoveries under the proportional method. The Change Notice described the NPCI Schedule as something "the companies should prepare to provide detailed information to the audit team, until such time as the information is reported on the revised FEO-96." Consequently, the FEA's auditors distributed the NPCI Schedule to many refiners and instructed them to file it as a supplement to Form FEO-96 for each month in which they passed through non-product costs.[114]

In March 1975 the paragraph of the Change Notice prescribing the use of a proportional method of recovery was incorporated into the FEA's Basic Refiner Audit Course Manual.[115] A section entitled "Desk Review of FEO-96" in Chapter VII of the Audit Course Manual contained the following reference to the NPCI Schedule attached to the Change Notice:

*Important Postscript*

In order for the FEO-96 to be [a] meaningful document and for the correct calculations of the Maximum Lawful Prices, it is important that the refiners make their calculations in accordance with the following schedules until formal schedule requirements are issued and a new FEO-96 is revised:

 a. Supplemental Schedule A

 b. Non-Product Cost Schedule (See CARD Audit Handbook 3–1975–1 [i. e. Change Notice]). *Calculations deviating from the methodology of the above listed schedules may be considered as potential violations.*[116]

Approximately ninety auditors received copies of this manual while attending one of three Basic Refiner Audit Courses conducted in the Spring of 1975.[117]

---

related to proportional recovery of non-product costs?

 A The confusion in my mind is whether he used the term "recovery" or "proportional allocations of costs," because my best recollection is that I was—that I had no understanding that what he was sending out essentially dealt with order of recoupment as opposed to the allocation of costs among product categories.

Luedtke Dep., Docket Item 73, pp. 46–47; *see id.* pp. 148–51. *See also* Docket Item 79, exh. A-1 (Memorandum from Gordon W. Harvey, Director, Office of Compliance Policy and Planning to Edwin P. Mampe, Director, Pricing Regulation Development, dated June 23, 1976).

 Because it is unnecessary to decide whether the FEA interpreted the regulations to require use of the proportional method, the possibility that the Office of General Counsel may not have officially sanctioned that method is immaterial.

**112.** Drance Aff'd, Docket Item 83, par. 9.

**113.** Docket Item 79, exh. A-3, pp. 7–10.

**114.** For example, by the end of February 1975, at least three of the six plaintiffs in these actions had received copies of the NPCI Schedule with directions to follow the instructions therein. Hayes Aff'd Docket Item 79, exh. B-2, pars. 7–10, 14 (Continental Oil Co.); Affidavit of Francis Sikorskas, Docket Item 79, exh. B-8, par. 6 (Amerada Hess Co.); Affidavit of John L. Williams, Docket Item 79, exh. B-7, par. 5 (Tenneco Oil Co.).

**115.** White Aff'd, Docket Item 87, pp. 137, 139, par. 4; Docket Item 79, exh. A-4, chapter IV, p. 2.

**116.** Docket Item 79, exh. A-4, chapter VII, p. 16.

**117.** White Aff'd, Docket Item 87, pp. 137, 139–40, par. 5.

For purposes of computing prices, the NPCI Schedule allocated available NPCI among the various product categories on the basis of sales volume in accordance with section 212.87(b).[118] In early March 1975 an official of the Gulf Oil Company convinced Mr. Drance that the use of section 212.87(b) to allocate non-product costs at the beginning of the month for pricing purposes was erroneous. Shortly thereafter Drance drafted a new schedule which used section 212.87(b) only to measure the total amount of NPCI allocable to covered, as opposed to exempt, products and used section 212.83(d) to allocate NPCI among the various products for purposes of computing both price increases and recoveries.[119] Under section 212.83(d), the percentage of the total available NPCI allocated to a particular product could not exceed the percentage of the total PCI allocated to that product.

The amended schedule, later denominated "Worksheet B," was distributed to RARP audit teams nationwide on March 12, 1975 as part of a draft of "Audit Module A, *Desk Review of the FEO-96*".[120] Fred W. Stuckwisch, Director of RARP and later the FEA's top compliance official,[121] distributed Audit Module A, including Worksheet B, in final form on May 19, 1975. The cover letter under which this material was distributed stated:

These modules are now *final* and should be inserted in your audit manuals as the *Official Guidelines,* subject of course to revisions due to future regulation changes.

\* \* \* \* \* \*

The worksheets and instructions for completing Worksheets A and B of Module A can now be shown to the refiners. The refiners may use these worksheets until the revised FEA-96 is issued. . . .
Docket Item 79, exh. A-10 (emphasis supplied).

Messrs. Stuckwisch and Drance met with a representative of the General Counsel's Office, W. Mayo Lee, and several other FEA officials on March 5, 1975 to discuss the revision of Form FEO-96. At this meeting the failure of the regulations to specify a method for computing cost recoveries was discussed and the fact that the FEA had instructed refiners to use the proportional method was noted.[122] Mr. Lee interpreted the regulations to require the recovery of non-product cost increases last.[123] In a memorandum dated March 20, 1975 to Donald Clyman, who supervised the effort to revise Form FEO-96, Lee and another member of the General Counsel's staff stated: "The pro-rata recovery of product vs. non-product costs is not set

---

**118.** Docket Item 79, exh. A-3, p. 7.

**119.** Drance Aff'd, Docket Item 83, par. 14. The FEA makes much of this change, claiming it demonstrates the clearly erroneous character of the auditor's interpretation of the regulations. For the reasons given in note 154 *infra,* the Court disagrees. In light of the Court's disposition of these cases, it is unnecessary to choose between the two versions of the proportional method. Furthermore, the Court considers the differences between the two methods insignificant, because section 212.83(d) governed cost recoveries under both methods.

**120.** *Id.* par. 14 & exh. 3; Docket Item 70, exh. A-7. The draft of Audit Module A was developed as part of an effort within FEA to adopt a "modular approach" to refiner audits in order to channel greater efforts into problem areas. *See* Docket Item 79, exh. D-12 (FEA's response to written questions submitted to it by Senator Kennedy).

**121.** *See* Landesman Dep., Docket Item 74, p. 35. As of May 19, 1975, Mr. Stuckwisch was Acting Associate Assistant Administrator for Compliance.

**122.** *See* Docket Item 92A, exh. E-1; Supplemental Affidavit of Andrew Drance, Docket Item 97A, par. 3 (Att. JJ); Affidavit of W. Mayo Lee, Docket Item 97A, par. 14 (Att. JJ). Mr. Lee was a staff attorney in the price regulation section of the FEA's Office of General Counsel. *Id.* par. 3. He helped draft the portion of the December 1974 amendments that deleted the prenotification procedure for NPCI. *Id.* pars. 4–6.

**123.** Lee Aff'd, Docket Item 97A, pars. 7 (Att. JJ). Lee first learned of the conflict between his view and the advice disseminated by the Compliance division in early 1975, while working on the revision of FEO-96. *Id.* pars. 8–9.

forth in the regulations."[124] This comment caused the committee revising Form FEO-96 to strike from the first draft of the new form language that would have required recoupment of cost increases on a pro-rata basis.[125] On April 24, 1975, the FEA issued a notice of a *proposed* revision of Form FEO-96. 40 Fed.Reg. 19120 (May 1, 1975). Line 18 of the proposed new form, which was referred to as Form FEA-P110–M–1, called for entry of the "non-product cost increases recovered in the month of measurement" for each of the product categories.[126] Neither the form nor the instructions provided any guidance concerning how to compute such recoveries, however.[127] In any event, the FEA failed to adopt a final revision of Form FEO-96 during the relevant period.

Mr. Drance "attempt[ed] to obtain clarification from the Office of General Counsel as to the correct method of recovery" several times in 1975.[128] On April 11 Drance sent a memorandum to Peter Luedtke, the Assistant General Counsel for Pricing, in which he clearly stated that RARP had instructed refiners to use the proportional method of . recovery even when they charged a price less than the maximum permissible price in excess of base price. Drance concluded: "This principle, if proper, needs to be spelled out by an amendment to the regulations."[129] Mr. Lee, a member of Mr. Luedtke's staff, drafted a proposed amendment to section 212.83(d) of the regulations which expressly would have required use of the proportional method of cost recovery.[130] When his superiors [131] failed to act upon the proposed amendment, Lee revised it to require use of the NPCI Last method.[132] In an affidavit, Lee stated:

> I hoped issuance of this notice would end all objections to using the non-product

**124.** Docket Item 92A, exh. E-2, p. 2.

**125.** *See* Lee Aff'd, Docket Item 97A, pars. 12, 16 (Att. JJ); Docket Item 92A, exh. E-3. Plaintiffs' exhibit E-3 is a copy of a memorandum for the files apparently written by Fred Laughlin, a consultant from Price Waterhouse & Co., summarizing a meeting on March 31, 1975 to review the comments on a draft of Form FEA-96. The memorandum states:
> It was decided to strike the language with regard to the pro-rata application of the recouped cost increases. There is nothing in the regulations that requires such a pro-rata application and *it was decided that until something is made clear on this issue, the form can reflect only what is in the regulations.* (Emphasis supplied).

**126.** 40 Fed.Reg. 19120, 19134, 19182 (May 1, 1975).

**127.** *See* Docket Item 79, exh. A-24, doc. no. 185 NR, par. 6. Plaintiff Continental promptly called this omission to the agency's attention, stating its assumption that cost recoveries could be computed using the proportional method. Hayes Aff'd, Docket Item 79, exh. B-2, att. D, p. 2 (letter dated May 12, 1975).

**128.** *See* Drance Aff'd, Docket Item 83, par. 15. Interaction between RARP and the General Counsel's Office apparently was commonplace. In response to a letter from Mobil Oil Corporation requesting an interpretation of the regulations to permit the banking of unrecovered NPCI for the limited purpose of maintaining current price levels, FEA Administrator Frank Zarb stated:

> [T]he points you made in reaching your interpretation . . . have been brought to the attention of the General Counsel and members of our Refinery Audit Review Program (RARP). *The members of our RARP group will assist the General Counsel in the interpretation and can also advise our auditors in the field as to how the regulations should be interpreted.*
> Docket Item 92A, exh. E-16 (letter dated June 9, 1975). One of the points made by Mobil was that the regulations required refiners to recover product and non-product cost increases proportionally. *Id.* exh. E-15.

**129.** Docket Item 79, exh. A-9, p. 2.

**130.** Docket Item 92A, exh. E-5, pp. 7–9, 19; Lee Aff'd, Docket Item 97A, par. 17 (Att. JJ).

**131.** Laura Kuitunen was Lee's immediate supervisor; she reported to Mr. Luedtke. Lee Aff'd, Docket Item 97A, par. 13 (Att. JJ); Luedtke Dep., Docket Item 73, pp. 36–37.

**132.** Lee Aff'd, Docket Item 97A, par. 18, exh. 4, pp. 7, 21. Lee proposed to add the following sentence at the end of section 212.83(d): "Furthermore, only revenues received from charging a price in excess of base price reflect non-product cost increases." The proposed amendment would have prevented refiners from recovering any non-product cost increases when the selling price was less than the base price. *Id.*

cost last sequence of recoupment and would persuade RARP to abandon its position in favor of pro-rata recovery, which was necessary if we were to be able to finalize the proposed [revision of Form FEO-96].

Docket Item 97A, par. 18. The comments of Mr. Drance on Lee's second proposal made it clear that RARP had not abandoned its position. To the contrary, Drance argued strongly in favor of permitting a proportional method of cost recovery, "regardless of whether or not base price had been reached," stating RARP considered such an option "the only feasible method to allocate and recover non-product costs." [133] On August 27, 1975, the FEA adopted some of the changes proposed in Lee's second draft but the agency took no action with respect to the method for computing cost recoveries.[134]

About the same time the FEA issued Ruling 1975–16—the strongest support for its contention that it interpreted the regulations in effect during the relevant period to require that non-product costs be recovered last. Ruling 1975–16 applied to resellers and retailers and interpreted the regulations governing such entities to require the NPCI Last method of cost recovery. 40 Fed.Reg. 40834 (September 4, 1975), *reprinted in* 3 CCH Energy Management ¶ 16,056.

In September 1975 a paragraph entitled "Latest Developments" was added to the section of the Basic Refiner Audit Course Manual that dealt with the allocation of allowable NPCI. This paragraph, which followed the examples illustrating the proportional method, stated "now the position is being taken that until a firm has exceeded its *BASE PRICE* there has not been an application of non-product cost." [135] Notably, the course manual still contained both the language advising auditors to use the proportional method and the language indicating that failure to perform calculations in accordance with Worksheet B could be considered a potential violation.

The apparent inconsistency between Ruling 1975–16 and the Change Notice rekindled RARP's interest in obtaining a clarification from the General Counsel's office.[136] Mr. Drance drafted an amendment to the Change Notice specifying that "all available product cost increases . . . must be recovered *before* any non-product cost increases can be recovered." [137] Drance discussed the draft amendment and the recovery of non-product cost increases in general with Messrs. Luedtke, Lee and Biondi of the Office of General Counsel on October 22, 1975.[138] Thereafter, Drance drafted a memorandum to be sent from Gordon Harvey, Director of the Office of Compliance Program Development, to Peter Luedtke summarizing the issues discussed at the meeting and presenting the recommendations of the Office of Compliance.[139] Mr. Harvey transmitted the memorandum to Mr. Luedtke on November 12, 1975 without any material changes. It contains several statements relevant to the disposition of this case. For example, the memorandum stated:

**133.** Docket Item 92A, exh. E-6, pp. 1–2 (memorandum dated July 3, 1975).

**134.** *See* 40 Fed.Reg. 39849 (August 29, 1975).

**135.** Docket Item 79, exh. A-13, p. 156 (emphasis in original). George White, who was the Coordinator of the Compliance Audit Review Program ("CARD"), wrote the "Latest Developments" paragraph after Mr. Drance told him that the General Counsel's Office disagreed with the proportional approach. White Aff'd, Docket Item 87, pp. 137, 141–42, par. 7.

**136.** *See* Drance Aff'd, Docket Item 83, par. 18.

**137.** *Id.* exh. 10 (emphasis in original); *see* Docket Item 79, exh. A-24, par. 9.

**138.** Drance Aff'd, Docket Item 83, par. 19 & exh. 10. George Biondi had written a memorandum to his superior, Mr. Landesman, Assistant General Counsel for Compliance, on August 12, 1975 identifying "how a firm determines the portion of its cost recoveries that are non-product cost recoveries, whenever estimated volumes differ from actual volumes," as an issue deserving attention. Docket Item 92A, exh. E-7, p. 3.

**139.** The draft from Drance was dated November 4, 1975 and was reviewed by Donald Clyman and Gordon Harvey of the Office of Compliance. Docket Item 79, exh. A-15.

Although the recovery of the non-product cost increases was not specifically covered by [section 212.83(d)], *the general interpretation held by both General Counsel and Compliance* [in December 1974] was that recoveries of non-product cost increases was [sic] to be made on a pro-rata basis with the recovery of increased product costs.

Docket Item 79, exh. A-16, p. 1 (emphasis supplied). Apparently, everyone at the October 22 meeting interpreted base price as fixed and recognized that the pro-rata method of recovery did "allow some finagling with the profit margin rule."[140] The Office of Compliance, however, took the position that section 212.83(d) could be interpreted to permit pro-rata recoveries of product and non-product cost increases even when the selling price was below base price.[141] As to whether a ruling or rule-making procedure would be required to clarify the purported intent of section 212.-83(d) to require use of the NPCI Last method, Mr. Harvey observed:

I believe that because of the fact that most of the refiners who are passing through non-product cost increases are doing so on a pro-rata basis, without regard to their full-base price, at a minimum a ruling is required [to impose an NPCI Last sequence]. *If a strong enough argument can be made that the pro-rata language is actually contained in 212.83(d) (and I think it is), then a rulemaking is required.*

Docket Item 79, exh. A–16, p. 4 (emphasis supplied). Finally, the Office of Compliance recommended against the adoption of the strict interpretation of the regulation (mandating recovery of all product costs first) contained in the amendment to the Change Notice drafted by Mr. Drance. *Id.* at 5.

The FEA did not adopt the draft amendment submitted by Mr. Drance or any other amendment to the Change Notice before February 1, 1976 (the end of the relevant period). Instead, the General Counsel's Office seems to have kept the matter under advisement. In a memorandum dated December 23, 1975, responding to a request from Mark Silverman, Associate Assistant Administrator for Regulation Development, for a review of "various inconsistencies or omissions in the FEA's nonproduct rules,"[142] Mr. Luedtke said:

[T]he question of "pro rata" recovery of non-product cost increases for refiners under § 212.83(d) . . . is already the subject of inter-office discussion and review (see Gordon Harvey's memorandum to me of November 12, 1975 . . . ).[143]

On January 7, 1976 the FEA proposed amendments to the petroleum price regulations to reflect the pricing policies of sections 401 and 402 of the Energy Policy and Conservation Act.[144] The amendments concerned the pass-through of banked PCI, but the notice of proposed rulemaking did not discuss the method of allocating cost recov-

**140.** Docket Item 79, exh. A-16, pp. 2–3; *see* Drance Aff'd, Docket Item 83, par. 19.

**141.** Docket Item 79, exh. A-16, pp. 3–5. In the memorandum Mr. Harvey stated: "The regulation 212.83(d) addresses itself to recovery of non-product cost *above* base price, describing a pro-rata method of allocating costs. *It does not specifically speak about allocation of non-product costs below base price leaving open the interpretation that it could be applied.*" *Id.* at 3 (emphasis supplied). And further, "the regulations [c]ould have been interpreted otherwise [than as requiring use of the NPCI Last method], and in fact, compliance guidance did interpret the regulations otherwise." *Id.* at 5.

**142.** Docket Item 79, exh. A–19. On December 18, 1975, Mr. Silverman had forwarded to Mr. Luedtke a memorandum from Chuck Boehl delineating several apparent inconsistencies or omissions in the application of the non-product cost rules to refiners as opposed to resellers and retailers. *Id.* Specifically, Mr. Boehl noted that the regulations governing refiners "state [non-product cost increases] are non-bankable but enforcement permits a ratio of nonproduct to product costs pass through even if part of the product costs are banked." *Id.* par. 3.

**143.** Docket Item 92A, exh. E–8, p. 2.

**144.** 41 Fed.Reg. 1680 (January 9, 1976); *see* note 31 *supra.*

eries. Many refiners complained about the FEA's failure to specify a sequence of cost recovery, and, as a result, it added a provision explicitly requiring use of the NPCI Last method when it adopted the proposed regulations on February 1, 1976.[145] The agency also stated in the preamble that, except for certain complexities introduced by the EPCA and not relevant here, "the order specified in the new § 212.85 is the same as that under the regulations previously in effect." That is, "[i]ncreased non-product . . . costs must be recouped last." 41 Fed.Reg. 5113 (February 4, 1976). This statement represents the *only* explicit endorsement of a method of cost recovery for refiners, other than the proportional method, and it was published by the FEA after the relevant period.

As noted earlier, the FEA repealed the regulation specifying the NPCI Last method only two months after it had been adopted.[146] Nonetheless, the agency has stood by its assertion that the regulations affecting prices from January 1, 1975 to February 1, 1976 required all product costs to be recovered before any non-product costs could be recovered.

The preceding review of the undisputed record of contemporaneous construction in these cases permits the Court to draw several conclusions. First, a dispute existed within the FEA from at least March of 1975 over the proper method under the regulations for allocating cost recoveries. The Office of Compliance supported a liberal interpretation of the regulations that would have required costs to be recovered on a pro rata basis, while the Office of General Counsel supported a strict interpretation that would have required non-product cost increases to be recovered last. Staff members from these two Offices met several times during the relevant period to attempt to resolve their differences and clarify the agency's position on the issue but to no

avail. Finally, on February 1, 1976 the FEA publicly announced that it interpreted the regulations to require use of the NPCI Last method.

Second, the public pronouncements of the FEA's auditors and several of its officials during the relevant period overwhelmingly supported the proportional method of recovery. Although the FEA undermined the strength of that support when it failed to mention the proportional method in the proposed Form FEA–P110–M–1 and when it issued Ruling 1975–16, which expressly required *resellers and retailers* to recover NPCI last, none of the agency's actions indicated unequivocally that refiners should use a method of recovery other than the proportional method. The Change Notice remained in effect until after the end of the relevant period.

The record of contemporaneous construction suggests that confusion existed within the FEA and among refiners regarding the proper method for computing cost recoveries, and that the FEA, which presumably could have eliminated the confusion by interpreting the regulations to require a particular method, did not decide which method was correct until the end of the relevant period. The FEA, however, contends the proportional method introduced by the Change Notice was clearly erroneous and that by early 1975 the auditors who advocated its use had retracted their support. Further, the FEA avers no one "forcefully" brought the fact that the auditors had advised refiners to use the proportional method to the attention of any high agency officials and once such officials became aware of the problem they acted swiftly to remedy it. According to the FEA, the regulations clearly required use of the NPCI Last method and the Office of General Counsel consistently so interpreted them; therefore, the agency had no reason to do anymore than it did.

**145.** 41 Fed.Reg. 5111, 5113, 5120 (February 4, 1976). The NPCI Last provision was codified at 10 C.F.R. § 212.85.

**146.** The repeal was made retroactive to February 1, 1976. *See* notes 35–37 *supra* and accompanying text.

The Court considers first whether the Change Notice was clearly erroneous.[147] As previously noted, the drafters of Change Notice 3–1975–1 decided to advise auditors to compute cost recoveries proportionally based on an inconsistency they perceived between sections 212.83(d) and 212.87(b) and their belief that proportional recovery made sense from a policy standpoint.[148] The FEA contends no inconsistency existed between the sections cited by Mr. Drance at the time RARP issued the Change Notice. To the contrary, the FEA argues each of the regulations affecting prices after January 1, 1975 clearly had a distinct purpose.

[T]he amended regulations contained *straightforward* language for measuring the amount of a refiner's nonproduct cost increases (§ 212.87), allowing such increases to be passed through in prices in excess of base prices (§ 212.82(c)), and specifying the manner of applying such increases to base prices (§ 212.83(d)). The banking regulation and the FEO–96 then dictated the order in which these nonproduct costs and product costs could be recovered.[149]

The simplicity of this explanation is appealing, but it demonstrates only the ability of the FEA's lawyers, after nearly two years of trying, to create an appearance of order and clarity in an area where the record shows nothing but confusion actually existed. The tortuous path the FEA has asked this Court to follow in these cases represents a poor substitute for straightforward language like: a refiner must recover all its available product cost increases before it may recover any non-product cost increases. The Court already has held that the banking provision and Form FEO–96 did not dictate a method or sequence of cost recovery. If those provisions had clearly required use of the NPCI Last method, as the FEA contends, it is difficult to understand why Mr. Drance, whose principal function during the nine months immediately preceding the adoption of the December 1974 amendments "was to review product cost recoveries and computations in the Forms FEO–96 being filed by certain refiners," [150] did not realize it.

Concerning the purported inconsistency between sections 212.83(d) and 212.87(b), the Court finds the auditors' conclusion reasonable and not clearly erroneous. Section 212.87(b) defined increased non-product costs for each month of measurement to be the sum of the increases in certain specified cost categories, such as labor costs, "multiplied by $V_in/Vn$." [151]

**147.** The FEA repeatedly asserts that the plaintiffs in these cases have failed to meet their burden of proof. The burden the agency refers to appears to be that created by the well settled principle that the administrative construction of a regulation deserves great deference in a court and "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulations." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14 (1945); *Udall v. Tallman,* 380 U.S. 1, 16, 18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The argument is specious, for it assumes the conclusion to a principal issue in these cases—whether the FEA interpreted the regulations to require the NPCI Last method at any time during the relevant period.

**148.** Drance Aff'd, Docket Item 83, par. 7. The Change Notice acknowledged that section 212.-83(d), which expressly dealt with the allocation of NPCI for purposes of computing prices, did not address the recovery issue. *Id.* exh. 1, p. 3; *see* text following note 108, *supra.*

**149.** Reply Brief in Support of Defendant's Motion for Summary Judgment, Docket Item 94, p. 26.

**150.** Drance Aff'd, Docket Item 83, par. 5. Drance stated that during the prenotification period he had no contact with prenotified non-product cost increases because prenotification requests on Form CLC–22 were handled in another office. *Id.*

**151.** The relevant provisions in section 212.87(b) are:

(b) *General definition.* (1) Increased non-product costs are, for each month of measurement, the sum of the refinery fuel cost increase, the labor cost increase, the additive cost increase, the marketing increase, and the other allowed non-product cost increases, (as defined in this section) multiplied by $V_in/Vn$ where:

$Vn$ = The total volume of all covered products . . . and all products refined from crude petroleum other than covered products sold in the period "n" (the consecutive three month period of the preceding year such that the middle month of the period corresponds to the current month "u").

$V_in$ = The total volume of covered products . . . sold in the period "n". . . .

The same ratio symbol "$V_in/V_n$" appeared in the formulas for calculating the amount of increased product costs available for inclusion in the base prices of distillates, gasoline, and covered products other than special products ($i = 1$, 2 and 3, respectively).[152] In the latter context, the symbol "$V_in/V_n$" represented the ratio of the total volume of products in category "i" sold in the period "n" (represented by the symbol "$V_in$") to the total volume of all products, covered and exempt, sold in that same period. Being familiar with the ratio "$V_in/V_n$" from their work with PCI computations during the prenotification period, the compliance officials who drafted the Change Notice assumed it meant the same thing in section 212.87(b) as it did in the formulas for computing PCI.[153] Under this interpretation of the ratio, section 212.87(b) yielded three figures each month, representing the amount of NPCI available for application to the base prices of each of the product categories.

The definitions of "$V_in$" in sections 212.87(b) and 212.83(c)(2) were not the same, however. In section 212.87(b), $V_in$ represented the "total dollar volume of *covered products* . . . sold in the period 'n'." Under this definition, section 212.87(b)

yielded only one figure—the total amount of NPCI available for all covered products. Thus, whether section 212.87(b) provided a mechanism for allocating NPCI among product categories for pricing purposes depended on the interpretation of the term "$V_in$" in that section. For the reasons given in the footnote,[154] the Court concludes the auditors reasonably could have interpreted "$V_in/V_n$" as referring to three distinct ratios.

In addition to the apparent inconsistency between the two allocation provisions, several other considerations supported the auditors' conclusion that the proportional approach specified in section 212.83(d) should be applied to cost recoveries. These include the absence of an express provision specifying a method of cost recovery, the fact that few provisions other than section 212.83(d) gave any indication of the proper relationship between PCI and NPCI, the admitted obsolescence of Form FEO–96,[155] and the cogent policy arguments in favor of a proportional method of recovery.[156] Against this background, the Court finds the auditors' interpretation of the regulations to permit the proportional method of recovery, regardless of whether the prices charged by a refiner exceeded base prices, to be reason-

39 Fed.Reg. 42373 (December 5, 1974).

**152.** 10 C.F.R. § 212.83(c)(2), 39 Fed.Reg. 42370 (December 5, 1974).

**153.** Drance Aff'd, Docket Item 83, par. 7.

**154.** In effect, the FEA argues that it would be clearly erroneous to ignore the language defining $V_in$ in section 212.87(b). Several factors suggest the FEA made a technical mistake in drafting that definition, however. First, the original definition of "$V_in$" in section 212.87(b) rendered the subscript "i" superfluous, because the symbol represented the total volume of *all* covered products sold in period "n", not just the volume of distillates ($i = 1$) or of gasoline ($i = 2$) and so on. On this point, it is noteworthy that elsewhere the FEA used the symbol "vn" to represent the total volume of all covered products refined from crude petroleum and sold during period "n". 39 Fed.Reg. 32728 (September 10, 1974). Second, it is logical to assume that a single variable, such as "$V_in$" will mean the same thing in two different regulatory sections when those two sections appear

in the same subpart of the regulations. Finally, the FEA amended the definition on February 28, 1975 to make it conform in all relevant respects to the definition applicable in the PCI computations. The amendment provided:

$V_iu$ = The total volume of a specific covered product . . . of the type "i" . . . estimated to be sold in the period "u".

40 Fed.Reg. 10444, 10448 (March 6, 1975). (The change in superscript from "n" to "u" is irrelevant to these cases). In light of these factors, the auditors' interpretation of section 212.87(b) appears reasonable.

**155.** *See* 39 Fed.Reg. 32721 (September 10, 1974).

**156.** *See* Drance Aff'd, Docket Item 83, par. 7; Memorandum from Drance to Lee, dated July 3, 1975, Docket Item 92A, exh. E–6. The FEA cited some of the same reasons when it repealed the NPCI Last requirement retroactive to February 1, 1976. *See* 41 Fed.Reg. 15331 (April 12, 1976).

able and consistent with the regulatory scheme.[157]

The contemporaneous construction of the regulations during the relevant period belies the FEA's contention that the RARP auditors retracted their support for the proportional method early in 1975. In July 1975, after reviewing a proposed amendment to the regulations circulated by an attorney in the Office of General Counsel that would have spelled out the NPCI Last requirement, Mr. Drance commented:

> There are two viable options as we see it. The first is the very restrictive one which has been described above. The second would be a more liberal one, in which a pro-rata recovery would be permitted, regardless of whether or not base price had been reached.
>
> In our opinion, this second option is the only feasible method to allocate and recover non-product costs.[158]

On November 12, 1975, after more discussion with the General Counsel's staff, Gordon Harvey, the Director of the Office of Compliance Program Development, stated "If a strong enough argument can be made that the pro-rata language is actually contained in 212.83(d) (*and I think it is*), then a rulemaking is required" to impose an NPCI Last requirement.[159] These statements demonstrate the thoroughness with which the agency's compliance officials considered their position and the consistency of their support for the proportional method of recovery.[160] The well-considered opinions of

experienced compliance officers like Mr. Drance and Mr. Harvey bolster the Court's conclusion that the proportional method was consistent with the regulatory scheme.

■ The only remaining issue is whether the FEA interpreted the regulations during the relevant period to require use of the NPCI Last method. The record clearly indicates it did not. The FEA attempts to explain the public silence of the General Counsel's Office regarding the method of cost recovery by arguing: (1) there was no need to say anything because the regulations clearly required non-product cost increases to be recovered last, (2) the General Counsel consistently so interpreted them, and (3) no one "forcefully" brought the fact that RARP had advised refiners to use the proportional method to the attention of "high agency officials" until late 1975, and shortly thereafter (February 1, 1976), the FEA explicitly required use of the NPCI Last method.

Because the regulations did not implicitly *require* use of any particular method of cost recovery and could have been construed to permit proportional recovery, the failure of the FEA to publicly interpret the regulations to require that non-product costs be recovered last during the relevant period is fatal to its argument here. None of the administrative interpretations and contemporaneous constructions cited by the FEA dealt specifically with the issue of cost recovery, except Ruling 1975–16,[161] which alone deserves further discussion.[162] Issued

---

**157.** This conclusion renders *Atlantic Richfield Co. v. Hickel*, 432 F.2d 587 (C.A. 10, 1970), which the FEA cites in support of its position, completely inapposite. In *Atlantic Richfield Co. v. Hickel*, the court upheld the power of the Secretary of the Interior to demand thirteen years' back royalties worth over $3 million to undo the effects of erroneous advice given to Atlantic by departmental officials. The Court disregarded the actions of the officials who advised Atlantic, because it found their advice contrary to the Congressional intent of the statutory section under which they purported to act. *Id.* at 592. Here, the advice disseminated by the FEA's auditors was consistent with the regulatory scheme.

**158.** Docket Item 92A, exh. E–6, p. 1 (memorandum dated July 3, 1975).

**159.** Docket Item 79, exh. A–16, p. 4 (emphasis supplied).

**160.** The amendment made in March 1975 to require allocation of costs for pricing purposes according to section 212.83(d) instead of 212.-87(b) constituted a technical change only; it did not alter the auditors' position in favor of proportional recovery. *See* notes 118–19 *supra.*

**161.** 40 Fed.Reg. 40834 (September 4, 1975), *reprinted in* 3 CCH Energy Management ¶ 16,056.

**162.** The Court has discussed virtually all the statements relied on by the FEA in the course of reviewing the base price rule, the banking provision and Form FEO–96, and the prohibi-

on August 29, 1975, Ruling 1975–16 interpreted the pricing sequence in the regulations governing *resellers* and *retailers*[163] to require use of the NPCI Last method of cost recovery. According to the FEA, this explanation of the sequence of cost recovery was directly relevant to *refiners,* since prices under the reseller and retailer price regulations were comprised of precisely the same elements as refiners' prices—i. e., May 15, 1973 selling prices, plus increased product costs, plus increased non-product costs.

Again the defendants' argument fails. Ruling 1975–16 makes no mention of refiners, who are governed by a different subpart of the regulations than resellers and retailers.[164] The differences between these two sectors of the industry often required differing treatment under the regulations. Mr. Luedtke, the Assistant General Counsel for Pricing, defended some of the regulatory distinctions in a letter, dated December 23, 1975, to the Associate Assistant Administrator for Regulation Development.[165] Mr. Luedtke acknowledged that the Office of Compliance had permitted refiners to recover NPCI on a pro-rata basis but stated the issue was "already the subject of inter-office discussion and review."[166] Such a noncommittal response to a letter criticizing the pro-rata method suggests that the General Counsel's Office did not consider the NPCI Last rule for resellers and retailers announced four months earlier in Ruling 1975–16 controlling with respect to refiners.

Finally, the record does not support the agency's argument that no one in a position to resolve the cost recovery problem knew that Compliance had disseminated "erroneous" advice endorsing the proportional method until it was too late. Mr. Lee described Mr. Luedtke as someone "in a position to get this matter resolved,"[167] and he had notice early in 1975. On April 11, 1975 Mr. Drance sent a memorandum to Mr. Luedtke, stating that RARP had advised refiners to recover PCI and NPCI on a pro-rata basis.[168]

In addition, several refiners informed high-ranking FEA officials that they were recovering product and non-product cost increases proportionally. On February 5, 1975, representatives of the Shell Oil Company met with four members of the FEA Operations, Regulations and Compliance staff and informed them that Shell interpreted the regulations to require use of the proportional method of cost recovery.[169] According to Shell, the FEA employees confirmed its interpretation and gave the Shell representatives a copy of the NPCI Schedule.[170] More importantly, Shell sent a letter to the Assistant Administrator for Operations, Regulations and Compliance on February 24, 1975 summarizing the meeting

tion against NPCI banking and has found them unpersuasive.

**163.** 10 C.F.R. Part 212, Subpart F (1975). Subpart E of Part 212 governed refiners.

**164.** The Court notes an apparent practice of the FEA to state explicitly that a ruling directed to firms governed by one Subpart of the regulations applies to firms governed by another Subpart, when it intends such a result. *See, e.g.,* Ruling 1974–1, 39 Fed.Reg. 3910 (January 30, 1974); Ruling 1974–17, 39 Fed.Reg. 21043 (June 18, 1974); Ruling 1975–4, 40 Fed.Reg. 19635 (May 6, 1975). Ruling 1975–16 did not contain a statement of that nature.

**165.** Docket Item 92A, exh. E–8; *see* note 142 *supra* and accompanying text.

**166.** Docket Item 92A, exh. E–8, p. 2.

**167.** Lee Aff'd, Docket Item 97A, par. 13.

**168.** Docket Item 79, exh. A–9, p. 2. Drance provided a brief example of the practical application of the proportional method in the memorandum. The Court also notes that Mr. Drance briefly consulted Mr. Luedtke before issuing the Change Notice.

**169.** Affidavit of Lawrence A. Wall, Docket Item 79, exh. B–20, pp. 2–5.

**170.** *Id.* par. 5. The FEA has submitted the Affidavit of Thomas F. Musico, one of the FEA officials who attended the meeting. The affidavit controverts the allegation that the FEA confirmed Shell's interpretation. Mr. Musico states that he advised the Shell representatives at the meeting that non-product cost increases had to be recovered last. Docket Item 87, p. 145, par. 8. Because these cases are before the Court on cross motions for summary judgment, the Court must assume Mr. Musico's recollection of the meeting is correct.

and indicating that Shell understood the FEA to have confirmed the proportional method.[171] Later, the plaintiff Continental Oil Company submitted written comments on the proposed Form FEA–P110–M–1, noting the omission from it of any guidance concerning cost recovery and stating Continental's assumption that proportional recovery was intended.[172] As additional examples, the Court notes that in May 1975 Mobil[173] and Exxon[174] both communicated to high ranking FEA officials the view that the regulations did not require refiners to recover NPCI last.

Finally, in August 1975 an FEA staff attorney recommended to Avrom Landesman, Assistant General Counsel for Compliance, that a ruling be issued describing the proper method to be used by refiners in recovering product and non-product costs.[175]

 The frequency with which refiners and the FEA's auditors, compliance officials and staff attorneys raised the method of recovery issue during the relevant period leads inescapably to the conclusion that the FEA knew about the confusion but chose to remain silent until February 1, 1976.[176] In the face of so many public indications that non-product cost increases did *not* have to be recovered last, this Court owes no deference to the contrary opinions expressed within the agency but not announced publicly during the relevant period. Therefore,

the Court holds that the FEA did not interpret the regulations affecting prices during the relevant period to require use of the NPCI Last method until after the period had ended.

 Furthermore, there is no basis for according the February 1, 1976 interpretation of the regulations retroactive effect. Courts should not permit administrative agencies to apply *new* standards to regulated firms retroactively, unless the need to avoid "a result which is contrary to the statutory design or to legal and equitable principles" outweighs the ill effects of the retroactive application on the regulated. *SEC v. Chenery,* 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *California v. Simon,* 504 F.2d 430, 438–39 (T.E.C.A.1974). In *Retail, Wholesale & Department Store Union v. NLRB,* 151 U.S.App.D.C. 209, 219, 466 F.2d 380, 390 (1972), the court elaborated on the balancing requirement as follows:

> Which side of this balance preponderates is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision . . .; and *courts have not infrequently declined to enforce administrative orders when in their view the inequity of retroactive application has not been counterbalanced by sufficiently significant statutory interests.* (Citations omitted) (emphasis supplied).

171. Wall Aff'd, Docket Item 79, exh. B–20, att., p. 2.

172. Affidavit of F. Leon Hayes, Docket Item 79, exh. B–2, att. D, p. 2.

173. Mobil sent a letter to Administrator Zarb requesting an official interpretation on the scope of the prohibition on banking NPCI. Docket Item 92A, exh. E–15 (letter dated May 13, 1975). The letter clearly stated Mobil's understanding that the regulations required pro-rata recovery. *Id.* Administrator Zarb informed Mobil that "the points [Mobil] made in reaching [its] interpretation have been brought to the attention of the General Counsel and members of . . . (RARP)." Docket Item 92A, exh. E–16 (letter dated June 9, 1975). The FEA did not act on this request for interpretation during the relevant period.

174. Exxon apparently recovered non-product cost increases first and it feared the proposed Form FEA–P110–M–1 could be construed to

imply a pro-rata method of recovery. Exxon expressed its view that "any requirement that costs be recovered in the same manner as allocated by the proposed Form P–110 would constitute a substantive change in the present rule and would require a formal rulemaking proceeding" to several FEA officials in Washington on May 14, 1975. Affidavit of T. W. Gillette, Docket Item 92A, exh. E–10, par. 24; Supplemental Affidavit of Andrew Drance, Docket Item 97A, pars. 4–6.

175. Docket Item 92A, exh. E–7, p. 3 (memorandum from George Biondi, dated August 12, 1975).

176. The belated adoption of an explicit NPCI Last rule does not connote anything with respect to the existence or validity of such a requirement in the original regulations. *See Van Der Loo v. Porter,* 160 F.2d 110, 113 (Em. App.1946).

In that case, the District of Columbia Circuit identified five considerations that enter into a resolution of the retroactivity issue; in the case *sub judice* three of those factors are determinative.[177] They are: (1) the extensive reliance of refiners on the absence of a required NPCI Last method of recovery, (2) the significant burden a retroactive imposition of an NPCI Last rule would have on refiners (the rule would force a reduction of approximately $1.3 billion in refiners' banks),[178] and (3) the absence of any substantial statutory interest which would be served by applying the rule retroactively given the reliance of the plaintiffs and others on the auditors' advice to use the proportional method.[179] In light of these factors, the Court will not permit the FEA to cure the omission of a recovery rule in the regulations by retroactively interpreting them to require use of the NPCI Last method.[180]

## IV. COMPLIANCE WITH THE APPLICABLE RULEMAKING REQUIREMENTS

■ Even if this Court were to accept the substantive arguments of the FEA, it

would hold the regulations prescribing a method of cost recovery and prohibiting NPCI banking invalid, because the FEA adopted those regulations without providing adequate notice and opportunity to comment under the applicable statutes.[181] Sections 4(b) and (c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b), (c), prescribe the notice and comment requirements applicable to the predecessors of the FEA.[182] Section 553(b)(3) requires publication in the Federal Register of "either the terms or substance of [a] proposed rule or a description of the subjects and issues involved" in a proposed rulemaking. Under Section 553(c), an agency must give interested persons an opportunity to comment and provide a concise general statement of the basis and purpose of any rule it adopts.

■ During the prenotification period no notice appeared in the Federal Register indicating the substance of either the NPCI Last requirement or the NPCI banking prohibition or announcing that the COLC or FEO intended to consider those subjects. The FEA, therefore, must establish that

---

**177.** The other two factors are "whether the particular case is one of first impression" and "whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law." *Retail, Wholesale & Department Store Union v. NLRB, supra,* 151 U.S.App.D.C. at 219, 466 F.2d at 390.

**178.** *See* "Results of Refiner Survey," 41 Fed. Reg. 40559, 40560 (September 20, 1976).

**179.** The FEA publicly admitted in August 1976 that "refiners might have concluded in good faith that recoupment on a proportional basis was permitted as a result of possibly ambiguous language in § 212.83(d) and certain information disseminated by FEA." 41 Fed.Reg. 33283 (August 9, 1976). The agency originally proposed a "class exception" to permit all unconstrained refiners to recompute their cost recoveries during the relevant period using "the proportional cost recovery approach," thereby implying that the proportional method did not contravene any substantial statutory or regulatory interest. *Id.* However, after Congressman Dingell harshly criticized the proposed class exception proceeding, the FEA suddenly abandoned its proposal and adopted the hard line position which eventually precipitated

this litigation. *See* notes 40–45 *supra* and accompanying text.

**180.** *See Standard Oil II, supra,* slip op. at 70–71; *Tobin v. Edward S. Wagner Co.,* 187 F.2d 977 (C.A. 2, 1951). As noted in the *Standard Oil II* opinion, striking similarities exist between the FEA's actions during the relevant period in these cases and the OPA's actions in *Sampson v. Clark,* slip op. at 68–70. In the *Sampson* case, the court refused to give retroactive effect to an interpretation of certain price regulations that essentially amended the regulations to cure an omission. 162 F.2d at 735–36.

**181.** The Court finds it unnecessary to decide the other procedural issues raised by the complaints in these cases, viz., whether the regulations as now interpreted by the FEA are invalid because they exceeded the FEA's authority or because they were adopted without first obtaining an inflationary impact statement in violation of Executive Order No. 11821, 39 Fed. Reg. 41501 (Nov. 29, 1974).

**182.** *See Tasty Baking Co. v. COLC,* 529 F.2d 1005, 1014 (T.E.C.A.1975); *Shell Oil Co. v. FEA,* 527 F.2d 1243, 1248 (T.E.C.A.1975).

these purported regulations fell within one of the two exceptions to the notice provisions of section 553(b).[183] First, the APA notice and comment requirements do not apply to "interpretative rules." In *Pharmaceutical Manufacturers Association v. Finch*, 307 F.Supp. 858, 863 (D.Del.1970), this Court held the exception for interpretative rules does not apply "when a proposed regulation of general applicability has a substantial impact on the regulated industry." The touchstone in determining whether a rule is interpretative is the basic purpose of the statutory notice and comment requirements. "When an agency action has 'palpable effects' upon the regulated industry and the public in general, it·is necessary to expose the action 'to the test of prior examination and comment by the affected parties.'" *National Helium Corp. v. FEA, supra*, 569 F.2d at 1137, 3 CCH Energy Management ¶ 26,088 at p. 26739; *National Motor Freight Traffic Association v. United States*, 268 F.Supp. 90, 96 (D.D.C. 1976) (three judge court), *aff'd per curiam*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). As noted earlier, the regulations in effect during the prenotification period afforded refiners considerable flexibility in passing through non-product costs increases. Thus, a regulation effectively prohibiting NPCI banking, and thereby eliminating this flexibility, would have had a substantial impact on refiners. A regulation imposing an NPCI Last sequence of cost recovery would have had an even greater impact. Thus, neither the banking prohibition nor the NPCI Last requirement falls within the interpretative rule exception. *See Pharmaceutical Manufacturers Association v. Finch, supra; St. Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323, 328–29 (N.D.Cal.1976).[184]

■ The second exception to the notice and comment requirements of Section 553 applies only where there has been an express finding for good cause "that notice and comment are impracticable, unnecessary or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). There was no express finding of good cause regarding either of the two regulations at issue here.[185] Accordingly, the Court holds invalid and unenforceable any NPCI Last requirement or prohibition on NPCI banking which may have been implicit in the regulations prior to the relevant period.

The rulemaking procedures of the Federal Energy Administration Act of 1974 ("FEAA")[186] govern adoption of the regulations affecting prices during the relevant period. Although the Act incorporates the procedures of the APA,[187] sections 7(i)(1)(B) and (C) impose on the FEA publication and comment requirements even more rigorous

---

**183.** Section 553(b) of Title 5 provides in pertinent part:

Except when notice or hearing is required by statute, this subsection does not apply—
(A) to interpretative rules, general statements of policy or rules of agency organization, procedure, or practice; or
(B) when the agency for good cause finds (and incorporates the finding and a ·brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**184.** In *St. Francis Memorial Hospital v. Weinberger, supra*, the Court considered the existence of a "genuine ground for a difference of opinion on the wisdom of the policy embodied in the rule" to be another factor precluding classification of a rule as interpretative. 413 F.Supp. at 329. The debate within the FEA throughout the relevant period and the storm of protest ultimately leading to the repeal of the February 1, 1976 NPCI Last rule and the banking prohibition demonstrate beyond peradventure the existence of genuine policy issues with respect to both those rules. In other words, the rules should have been subjected to the test of prior examination and comment.

**185.** This case is distinguishable from *National Helium Corp. v. FEA, supra*, because the NPCI Last requirement and the banking prohibition were not merely technical in nature and the failure to give notice of these purported regulations caused substantial detriment and unfairness to the plaintiffs herein. *See* 569 F.2d at 1146, 3 CCH Energy Management ¶ 26,088, at pp. 26,737–39.

**186.** 15 U.S.C. § 761 *et seq.* Congress enacted the FEAA on May 7, 1974; the Act became effective sixty days later. Pub.L. No. 93–275, § 30, 88 Stat. 97 (1974).

**187.** Section 7(i)(1)(A), 15 U.S.C. § 766(i)(1)(A).

than those provided for in the APA. These FEAA provisions require that the FEA: (1) publish the proposed rule, regulation or order in the Federal Register, (2) provide an opportunity to comment for a minimum of 10 days following publication unless waived by a statutorily specified finding, and (3) afford an opportunity for oral presentation of "views, data and argument," *if* the rule, regulation or order is likely to have a substantial impact either on the nation's economy or on a large number of individuals or businesses.[188] The FEA adopted the two regulations at issue here without satisfying either the second or third of these requirements.[189]

■ The FEA first published the provision prohibiting the banking of non-product cost increases on December 5, 1974—four days after the regulation became effective.[190] Therefore the promulgation of the banking prohibition violated the 10-day notice provision of the FEAA, unless the FEA waived the requirements of notice and opportunity to comment.[191] The FEAA provides an exception to the notice and opportunity to comment requirements only

> where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order.

15 U.S.C. § 766(i)(1)(B). The rule adopted in December 1974 contained no express finding of serious harm or injury. Hence, the Court holds that the FEA failed to provide the requisite 10-day notice and comment period when it adopted the regulation prohibiting the banking of NPCI. See *Standard Oil II, supra,* slip op. at 75–76.

Similar procedural infirmities afflict the purported requirement that non-product costs increases be recovered last. This requirement became effective on February 1, 1976 but was not published in the Federal Register until February 4, 1976. The FEA provided no notice before the effective date of the regulation and no 10-day comment period. The February 1, 1976 rulemaking contained no express waiver of the notice and comment requirements of section 7(i)(1)(B) of the FEAA. 15 U.S.C. § 766(i)(1)(B).

■ Even if, contrary to this Court's holding, the NPCI Last requirement were implicit in the regulatory scheme in effect throughout the relevant period,[192] that requirement would be invalid and unenforceable due to the FEA's failure to provide notice and an opportunity to comment. The legislative history of the FEAA evidences Congress' intent to ensure the FEA

---

**188.** The first two requirements are contained in section 7(i)(1)(B), 15 U.S.C. § 766(i)(1)(B); the third requirement appears in section 7(i)(1)(C), 15 U.S.C. § 766(i)(1)(C).

**189.** There is some question whether the notice, comment, and publication provisions of the FEAA were intended to supplant the analogous provisions of the APA, or to complement them. In the cases at bar, it is clear that the provisions of the FEAA apply and were not satisfied; therefore, the Court need not decide the applicability of the notice and comment provisions of the APA. *See Shell Oil Co. v. FEA,* 440 F.Supp. 876, 881–82 n. 25 (D.Del.1977).

**190.** 39 Fed.Reg. 42369, 42372 (December 5, 1974). The FEA also may have violated the publication requirement, because it published the nonbanking rule as a final regulation and not as a proposed rule as the statute requires. *See* 15 U.S.C. § 766(i)(1)(B). The same comment applies to the agency's publication of the NPCI Last rule on February 4, 1976.

**191.** The FEA argues that several related items, including the proposed curtailment of PCI banking and the absence of a provision authorizing the banking of NPCI, put refiners on notice that the agency intended to ban the banking of non-product cost increases. However, the FEA's lawyers stated in their briefs that under the amendments proposed in September 1974 "banking of nonproduct costs might . . . have appeared possible." Reply Brief in Support of Defendants' Motion for Summary Judgment, Docket Item 94, p. 57. More importantly, the FEA's argument ignores the stringent notice requirements imposed by section 7(i)(1)(B). That section requires publication of the rule itself, not "clues" from which a regulated party might deduce the agency's intent.

**192.** The invalidation of the prohibition against NPCI banking on procedural grounds further weakens the FEA's argument that the regulations implicitly required use of the NPCI Last method.

is alert to the views of industry and the public before it promulgates significant rules or regulations. *See Shell Oil Co. v. FEA, supra,* 440 F.Supp. at 882–84, 887. A requirement that non-product costs increases be recovered last instead of proportionally with product cost increases would have affected many refiners and caused substantial reductions in their banks, as well as changes in their pricing policies. The repeal of the NPCI Last requirement almost immediately after the FEA first subjected it to the harsh light of public scrutiny further demonstrates that the rule should have been promulgated in full compliance with the notice and comment requirements of the applicable statutes. This Court concurs fully with the following assessment made by Judge Manos in *Standard Oil II, supra:*

> In adopting the all product costs first theory of increased cost recovery [i. e., NPCI Last method], the FEA and its predecessor agencies never complied with th[e] procedural requirements [of the FEAA or the APA]. The FEA continues to rely on the masquerade that compliance with these requirements was not necessary because it never changed the implicit requirements of the regulations. Yet, this court has found that nowhere prior to the February 1, 1976 rulemaking did the agency ever give notice that it required an all product cost first sequence for the recoupment of increased product and non-product costs. The agency did not furnish advance notice of the subject matter or the issues presented by such a rule. The agency did not furnish advance notice of the rule itself, or provide the public with the required opportunity for the presentation of written comments. Nowhere did the FEA furnish the public the required opportunity for oral comment, despite the rule's enormous impact, and nowhere did the agency publish a

statement of basis and purpose for such a rule.

slip op. at 73.

■ Finally, the record indicates that application of the NPCI banking prohibition and the NPCI Last rule during the relevant period would have had a "substantial impact" within the meaning of section 7(i)(1)(C). Therefore, the FEA also had a duty to afford interested persons an opportunity for "*oral* presentation of views, data, and arguments." [193] The agency violated this procedural requirement in adopting both the banking prohibition and the NPCI Last rule.

The appropriate remedy for a violation of the notice and comment provisions of the FEAA is to declare the regulation void *ab initio. Shell Oil Co. v. FEA, supra,* 440 F.Supp. at 887.[194] Accordingly, the Court holds that no valid and enforceable regulation prohibiting the banking of NPCI or requiring use of the NPCI Last method of cost recovery existed during the relevant period.

## CONCLUSION

The plaintiffs seek a declaratory judgment that prior to February 1, 1976 the FEA's regulations permitted them to use the proportional method of cost recovery, and an injunction prohibiting the FEA from enforcing against them any regulation that purports to require use of the NPCI Last method. In the alternative, plaintiffs seek to invalidate any NPCI Last requirement and the prohibition against the banking of non-product cost increases on the ground that those regulations were adopted in violation of the applicable statutory rulemaking requirements. The FEA contends the regulations in effect since September 1973 always implicitly required that non-product cost increases be recovered last, because any other method of recovery would contra-

---

**193.** *See* Section 7(i)(1)(C) of the FEAA, 15 U.S.C. § 766(i)(1)(C).

**194.** Generally, agency action taken in disregard of statutory rulemaking procedures is void. *See, e. g., Shell Oil Co. v. FEA, supra,* 527 F.2d at 1248; *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Consumers Union of United States, Inc. v. Sawhill,* 393 F.Supp. 639 (D.D.C.), *aff'd per curiam,* 523 F.2d 1404 (T.E.C.A.1975).

vene the base price rule, the PCI banking provisions, and the prohibition against NPCI banking. The Court examined the regulations affecting prices in effect before December 1, 1974 and concluded that the regulations did not contain a tacit prohibition against NPCI banking. Further, the Court concluded the base price rule and the PCI banking provision did not implicitly require the use of the NPCI Last method of cost recovery.

The FEA substantially revised the procedures for passing through NPCI on December 1, 1974, adopting, among other things, an express provision banning the banking of non-product cost increases. The regulations did not refer explicitly to the allocation of cost recoveries issue, and the Court found nothing in them that implicitly precluded the use of the proportional method. The substantial amount of evidence of contemporaneous construction available to the Court in these cases clearly established two additional points. First, even if the regulations reasonably could have been interpreted to require that NPCI be recovered last; they also could have been interpreted to require that product and non-product cost increases be recovered proportionally. In the face of such an ambiguity, the FEA could not remain silent. Yet, the second conclusion to be drawn from the contemporaneous construction of the regulations is that the FEA did not decide to require use of the NPCI Last method until the very end of the relevant period. Further the agency did not publicly announce that decision until February 1, 1976. Finding this belated interpretation of the regulations did not qualify for retroactive application, the Court concluded the regulations affecting prices from January 1, 1975 to February 1, 1976 did not require the use of any particular method of cost recovery. The Court also concluded that the proportional method reasonably comports with the express regulatory provisions affecting NPCI during the relevant period.

Finally, the FEA and its predecessors never complied with the notice and comment provisions of the APA and the FEAA in conjunction with the purported adoption of either the prohibition of NPCI banking or the NPCI Last requirement. As a result both provisions, to the extent they existed, are void and unenforceable.

Accordingly, the Court will enter an order granting summary judgment in favor of plaintiffs and against defendants and awarding plaintiffs the abovementioned declaratory and injunctive relief.

An Order will be entered in accordance with this Opinion.